1  CARNEY BATES & PULLIAM, PLLC
   Randall K. Pulliam (*pro hac vice*)
2  rpulliam@cbplaw.com
   519 West 7th St.
3  Little Rock, AR 72201
   Telephone:  (501) 312-8500
4  Facsimile:  (501) 312-8505

5  JACOBSON PHILLIPS, PLLC
   Joshua R. Jacobson (*pro hac vice*)
6  joshua@jacobsonphillips.com
   2277 Lee Rd., Ste. B
7  Winter Park, FL 32789
   Telephone: (321) 447-6461
8
9  CONN LAW, PC
   Elliot Conn, California Bar No. 279920
10 elliot@connlawpc.com
   100 Bush Street, Suite 1580
11 San Francisco, CA 94104
   Telephone: (415) 417-2780
12 Facsimile: (415) 358-4941

13 *Attorneys for Plaintiffs Samuel Vickery,*
   *Rae Fuller, and the Proposed Classes*
14

15              UNITED STATES DISTRICT COURT

16              NORTHERN DISTRICT OF CALIFORNIA

17                 SAN FRANCISCO DIVISION

18 SAMUEL VICKERY and RAE FULLER,          Case No.: 25-CV-3675-JSC
   individually, on behalf of all others similarly
19 situated, and on behalf of the general public,   CLASS ACTION

20                 Plaintiff,               **FIRST AMENDED COMPLAINT FOR**
                                            **DAMAGES AND EQUITABLE RELIEF**
21        v.                                **FOR VIOLATIONS OF:**
                                                **(1) THE MILITARY LENDING**
22 EMPOWER FINANCE, INC. dba                        **ACT, 10 U.S.C. § 987,** *et seq.*;
   EMPOWER,                                     **(2) THE TRUTH IN LENDING ACT,**
23                                                  **15 U.S.C. § 1601,** *et seq.*; and
                  Defendant.                     **(3) THE GEORGIA PAYDAY**
24                                                  **LENDING ACT, O.C.G.A. § 16-**
                                                    **17-2,** *et seq.*
25
                                            **JURY TRIAL DEMANDED**
26

27

28

─────────────────────────────────────────────
AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiffs Samuel Vickery, a Petty Officer in the U.S. Navy ("PO Vickery") and Rae Fuller, a Sergeant in the United States Army ("Sgt. Fuller"), on behalf of themselves and all others similarly situated, and on behalf of the general public, allege the following based upon personal knowledge as to themselves and upon information and belief and the investigation of their counsel as to all other matters, and bring this First Amended Class Action Complaint against Empower Finance, Inc. ("Empower" or "Defendant"), and allege as follows:

## NATURE OF THIS ACTION

1.      This Complaint seeks to protect active-duty armed service members and Georgia residents from Empower's predatory lending practices that violate the Military Lending Act, 10 U.S.C. § 987, *et seq.* ("MLA"), the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* ("TILA"), and the Georgia Payday Lending Act ("PLA"), O.C.G.A. § 16-17-2, *et seq*.

2.      Empower is in the business of payday lending through an earned wage access ("EWA") product—it makes funds available to its customers, who repay Empower principal and finance charges (including expedite fees and subscription charges) on payday. Its business model entails making high-frequency, short-term, and high-cost loans to consumers living paycheck to paycheck. Indeed, Empower specifically targets financially struggling households and has designed its cash advance product to foster repeat borrowing to maximize fees and boost profits.

3.      Despite advertising its loans as "no interest," "0% APR," and promising no mandatory fees, in practice, Empower routinely takes in **triple-digit** finance charges on loans it issues. The finance charges for these loans can reach absurd heights, making loans to Plaintiffs exceeding **1,000%** annual percentage rate ("APR"). The result is a financial product that extracts exorbitant fees from workers, encourages serial usage and dependance on the costly loans, worsens workers' financial circumstances, and traps them in a cycle of debt.

4.      Plaintiffs have used Empower's cash advance product—known as "Empower Advance" and "Empower Cash Advance"—for years. By virtue of the sky-high fees charged for cash advances, Empower has extended consumer credit and loans to Plaintiffs on numerous occasions in violation of the MLA, TILA, and PLA.

*//*

5.    Borrowing money that is repaid on payday is not an innovation; it is a loan. As EWA products have become more popular, the parallels to payday lending are striking. Like payday loans, Empower's cash advance product traps users in a cycle of reborrowing that increases their financial distress, all in service of generating revenue for a predatory lender. Considering the substance of the transactions, Defendant's Empower Advance transactions are in reality consumer credit.

6.    The MLA was enacted to protect United States active-duty service members and their dependents (collectively, "Covered Members") from predatory lending. Excessive debt endangers our nation's military readiness and is detrimental to service-member retention, morale, household stability, security clearances, and career advancement. Notably here, Empower makes no effort to fulfill its duty to determine whether it is lending to Covered Members or to provide legally mandated protections for them.

7.    In violation of the MLA, Defendant uses its cash advance product to saddle Covered Members with charges that yield a military APR ("MAPR") well in excess of the MLA's legal limit.

8.    Empower's consumer credit agreements violate the MLA in at least five ways: By (1) charging interest above the 36% statutory MAPR cap; (2) failing to provide any credit disclosures required by the MLA; (3) including a purported class action ban and waiver of jury trial; (4) including a mandatory binding arbitration clause; and (5) using a method of access to a deposit, savings, or other financial account maintained by the borrower as security for the obligation. 10 U.S.C. §§ 987(b), (c) & (e)(1)(2)(5)(6).

9.    Among the abusive lending practices that the MLA was designed to curb was predatory payday loans made to servicemembers.[1] In a Department of Defense report on predatory lending practices affecting military members (the "Report"), the egregious lending practices prevalent in the payday lending industry were highlighted.[2] The Report noted that

---

[1] *Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents*, U.S. DEP'T OF DEFENSE (Aug. 9, 2006), available at https://apps.dtic.mil/sti/pdfs/ADA521462.pdf.
[2] *Id.* at 10–16.

FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

payday lenders were "heavily concentrated around military bases," with statistics showing that communities with military installations "rank among the most heavily targeted communities in their respective states."[3] Military populations were targeted for an obvious reason: "active-duty military personnel are three times more likely than civilians to have taken out a payday loan," with such loans costing servicemembers over $80 million in abusive fees annually as of 2005.[4]

10.    And despite Georgia statutorily outlawing payday lending, Defendant has offered its short-term, high-cost cash-advance product to Georgia consumers for years. In violation of Georgia law, Defendant has used its product to extract from consumers finance charges drastically exceeding the applicable legal limit.

11.    Empower systematically violates the Truth in Lending Act by failing to make required disclosures concerning the interest rate charged as part of its loan agreements with consumers.

12.    Empower's business practices violate the MLA, TILA, and PLA and are part of a systematic nationwide policy and practice. Plaintiffs seek to hold Defendant accountable for its actions and prevent its predatory lending practices from continuing.

## PARTIES

13.    PO Vickery is an individual, over 18 years of age. At all times relevant, PO Vickery was a natural person and resident of Tierrasanta, California. He has been a member of the United States Navy since 2023. During the class period, PO Vickery was a Covered Member and an active-duty service member employed by the United States Navy.

14.    Sgt. Fuller, is an individual, over 18 years of age. At all times relevant, Sgt. Fuller was a natural person and a resident of Georgia. She has been a member of the U.S. Army since 2018 and is currently a Sergeant stationed at Fort Stewart in Georgia.

15.    Defendant Empower Finance, Inc., is a Delaware corporation with its principal place of business in San Francisco County, California. Empower has offered loan agreements to

---

[3] *Id.* at 10–11.
[4] *Id.* at 11.

FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

consumers, including Covered Members, since at least 2020, entering into millions of credit transactions.

## TOLLING OF THE STATUTE OF LIMITATIONS

16.    The Servicemember Civil Relief Act ("SCRA"), 50 U.S.C. § 3901, *et seq.*, tolls any and all limitations or repose periods for all active-duty military members, including those similarly situated to Plaintiffs, until their active-duty service concludes. Specifically, § 3936(a) of the SCRA provides:

> The period of a servicemember's military service may not be included in computing any period limited by law, regulation, or order for the bringing of any action or proceeding in a court, or in any board, bureau, commission, department, or other agency of a State (or political subdivision of a State) or the United States by or against the servicemember or the servicemember's heirs, executors, administrators, or assigns.

## JURISDICTION AND VENUE

17.    On April 28, 2025, Defendant removed this matter to this Court on the basis of federal question jurisdiction under 28 U.S.C. § 1331. Plaintiffs' Amended Complaint alleges federal claims under the MLA and TILA. Under the MLA, "[a]n action for civil liability . . . may be brought in any appropriate United States district court, without regard to the amount in controversy, or in any other court of competent jurisdiction." 10 U.S.C. § 987. Under the TILA, "any action … may be brought in any United States district court, or in any other court of competent jurisdiction." 15 U.S.C. § 1640(e).

18.    The Court has supplemental jurisdiction over the PLA claim under 28 U.S.C. § 1367(a), because the claim is "so related to claims in the action within [the Court's] original jurisdiction that they form part of the same case or controversy."

19.    In the alternative, this Court has jurisdiction over the PLA claim pursuant to the Class Action Fairness Act 28 U.S.C. § 1332(d), because: (a) this is a class action within the meaning of Rule 23 of the Federal Rules of Civil Procedure; (b) the proposed Georgia Class consists of at least 100 members; (c) at least one member of the proposed Georgia Class is a citizen of a state different from Empower; and (d) the amount in controversy as the proposed

1    Georgia Class exceeds $5,000,000, exclusive of interest and costs, aggregating the claims of all

2    class members.

3        20.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial

4    part of the events or omissions giving rise to the claims in this case occurred in this District.

5                                    **LEGAL BACKGROUND**

6    **The MLA Was Specifically Designed to Curb Predatory Payday Loans to Covered**

7                                          **Members**

8        21.    The DoD's Report on lending practices discussed the payday lending industry at

9    length.[5] The Report noted that payday lenders were "heavily concentrated around military

10   bases," with statistics showing that communities with military installations "rank among the

11   most heavily targeted communities in their respective states."[6]

12       22.    Military populations were targeted for an obvious reason: "active-duty military

13   personnel are three times more likely than civilians to have taken out a payday loan," with such

14   loans costing servicemembers millions in abusive fees.[7] Moreover, the military payment

15   architecture, and the Uniform Code of Military Justice to which servicemembers are bound,

16   make them particularly vulnerable to predatory payday loans:

17       Check-holding, a central feature of payday loans, is particularly risky for military
         borrowers. Every payday loan involves a prospective "bad" check. Military
18       borrowers are required to maintain bank accounts in order to receive direct deposit
         of military pay and are subject to the Uniform Code of Military Justice that
19       penalizes deliberately writing a check not covered by funds on deposit. Borrowers
         become trapped in repeat borrowing or renewals of loans in order to keep the check
20       used to obtain the loan from bouncing, a key reason that payday loans are debt
21       traps.[8]

22       23.    Similarly, the "military culture emphasizes financial responsibility, with basic

23   policy explicitly stating that Service members are to pay their just debts."[9]

24

25   [5] Report, *supra* n.1.
     [6] *Id.* at 10–11.
26   [7] *Id.* at 11.
     [8] *Id.* at 14. To be sure, EWA providers like Empower do not collect physical checks from their
27   customers at loan initiation, but instead takes a virtual check by requiring Covered Members to
     authorize automatic debits from bank accounts to repay their loans.
28   [9] *Id.* at 10.

                                               5

24.     While the precise EWA product offering was developed somewhat recently, its genre (small-dollar, short-duration, high-cost loans) is nothing new. In 2006, the DoD noted military "borrowers encounter[ed] a booming virtual market of small loan offers, payday loans, and 'military loans' via the Internet."[10] Those loans, like Empower's, "are delivered and collected online through electronic fund transfer."[11]

25.     The Report noted key similarities between the various predatory lending products—including payday loans and internet loans—that target the military, which accurately encapsulate Empower's business model:

(1) Predatory lenders seek out young and financially inexperienced borrowers who have bank accounts and steady jobs, but also have little in savings, flawed credit or have hit their credit limit. These borrowers are less likely to weigh the predatory loan against other opportunities and are less likely to be concerned about the consequences of taking the loan.

(2) Predatory lenders make loans based on access to assets (through checks, bank accounts, car titles, tax refunds, etc.) and guaranteed continued income, but not on the ability of the borrower to repay the loan without experiencing further financial problems.[12]

(3) . . . Increasingly the Internet is used to promote loans to Service members.

(4) Predatory products feature high fees/interest rates, with some requiring balloon payments, while others pack excessive charges into the product. The result of their efforts is to obfuscate the comparative cost of their product with other options available to the borrower.

. . .

---

[10] *Id.* at 15.

[11] *Id.* at 16.

[12] To that end, lenders' "use of checks, access to bank accounts, [and similar other methods of extracting repayment] pressure the borrow to consider loan payments as being their top priority." *Id.* at 44.

1    (6) Predatory lenders attempt to work outside of established usury limits, either by

2         attempting to obtain exemptions from federal and state statutes or by developing

3         schemes designed to circumvent existing laws.[13]

4    26.    The Report further found "high interest loans, whether provided as a payday loan,

5    military installment loan, or as a result of unscrupulous automobile financing can leave a Service

6    member with enormous debt, family problems, difficulty maintaining personal readiness and a

7    tarnished career."[14] As if being trapped in a debt cycle is not bad enough, some servicemember

8    victims of payday and other lenders experienced disciplinary action (ranging from reprimands to

9    "loss of promotions and separation from the military") as a result of their financial hardship.[15]

10   27.    Drawing from the bountiful evidence of servicemember abuse at the hands of

11   predatory lenders, the DoD concluded it could not "prevent predatory lending without assistance

12   from Congress, the state legislatures, and federal and state enforcement agencies."[16]

13   28.    To curb usurious interest rates, bogus fees, mandatory arbitration clauses and

14   other terms that required servicemembers to waive his or her right of recourse (such as the right

15   to participate in a plaintiff class), the DoD requested legislation that would prevent lenders from

16   preying on service members and endangering the nation's military readiness.[17]

17   29.    The American Bar Association and others expressed support for the DoD's

18   request, noting the urgent need for remedial Congressional action to curb predatory loan

19   practices harming servicemembers. The legislation requested was supported by the DoD,

20   military and veterans organizations, legal aid organizations, consumer advocacy groups, faith-

21   based organizations, and of course lawmakers.

22   _____

23   [13] *Id.* at 21–22.
     [14] *Id.* at 39.

24   [15] *Id.* at 41–42.
     [16] *Id.* at 46.

25   [17] Specifically, the DoD requested legislation protecting Service members "from unfair, deceptive
     lending practices and usurious interest rates and to require uniform disclosure of credit and terms.

26   Specifically, lenders should not be permitted to base loans on prospective bad checks, electronic
     access to bank accounts, mandatory military allotments, or titles to vehicles. All costs involved in

27   borrowing should be included in interest rate calculations and disclosures. Laws and regulations
     must be changed to close regulatory loopholes that leave non-resident military borrowers

28   unprotected in many states." *Id.*

30.     Congress answered the call and passed the MLA to protect Covered Members from unfair, deceptive, and excessively priced loans.

### The Military Lending Act

31.     In the wake of the DoD's investigations, in 2006, the Military Lending Act, 10 U.S.C. § 987 *et seq.*, was enacted.

32.     The MLA makes it unlawful for a creditor to "impose an annual percentage rate of interest greater than 36 percent with respect to the consumer credit extended to a Covered Member or a dependent of a Covered Member." 10 U.S.C. § 987(b).

33.     The MLA also requires mandatory disclosures in "consumer credit"[18] transactions with Covered Members, which include:

- A statement of the annual percentage rate of interest applicable to the extension of credit, 10 U.S.C. § 987(c)(1)(A);

- Any disclosures required under the Truth in Lending Act, 10 U.S.C. § 987(c)(1)(B); and

- A clear description of the payment obligations of the member or dependent, as applicable, 10 U.S.C. § 987(c)(1)(C).

34.     Additionally, the MLA prohibits creditors from including provisions in a consumer-credit transaction that require the Covered Borrower to submit to arbitration or to waive the borrower's right to legal recourse. 10 U.S.C. § 987(e).

35.     The MLA also prohibits lenders from using check or other method of access to a deposit, savings, or other financial account maintained by the borrower as security for an obligation.

### The Truth in Lending Act

36.     The Truth in Lending Act, codified at 15 U.S.C. § 1638, protects consumers by, *inter alia*, (i) requiring lenders to clearly disclose all terms and costs associated with loans, (ii)

---

[18] Under the MLA, consumer credit is defined as "credit offered or extended to a Covered Member primarily for personal, family, or household purposes," subject to a finance charge or payable by written agreement in more than four installments and outside the ambit of any of the identified exceptions.

1    allowing borrowers to easily compare different credit options, and (iii) preventing predatory

2    lending practices by making loan details transparent and standardized. In essence, TILA

3    promotes informed use of consumer credit by providing full disclosure of loan terms.

4        37.    Under TILA, creditors are required to make certain disclosures when participating

5    in closed-end credit transactions, such as those Empower offers here. Empower fails to make any

6    of the following required disclosures:

7    - "The 'amount financed', using that term, which shall be the amount of credit of

8        which the consumer has actual use," 15 U.S.C. § 1638(2)(A);

9    - "a statement of the consumer's right to obtain, upon a written request, a written

10       itemization of the amount financed," *Id.* at § 1638(2)(B);

11   - "The 'finance charge', not itemized, using that term," *id.* at § 1638(3);

12   - "The finance charge expressed as an 'annual percentage rate', using that term,"

13       *Id.* at § 1638(4);

14   - "The number, amount, and due dates or period of payments scheduled to repay

15       the total of payments," *Id.* at § 1638(6);

16   - "Descriptive explanations of the terms 'amount financed', 'finance charge',

17       'annual percentage rate', 'total of payments', and 'total sale price' as specified by

18       the Bureau," *Id.* at § 1638(8);

19   - "Where the credit is secured, a statement that a security interest has been taken in

20       (A) the property which is purchased as part of the credit transaction, or (B)

21       property not purchased as part of the credit transaction identified by item or type,"

22       *Id.* at § 1638(9);

23   - "A statement indicating whether or not the consumer is entitled to a rebate of any

24       finance charge upon refinancing or prepayment in full pursuant to acceleration or

25       otherwise, if the obligation involves a precomputed finance charge," *Id.* at §

26       1638(11); and

27   - "A statement that the consumer should refer to the appropriate contract document

28       for any information such document provides about nonpayment, default, the right

1    to accelerate the maturity of the debt, and prepayment rebates and penalties," *Id.*

2    at § 1638(12).

3    ## The Georgia Payday Lending Act

4    38.    Payday lending involves offering short-term loans, often for small amounts, with

5    repayment expected on the borrower's next payday. These loans are frequently marketed as a

6    quick solution for bridging financial gaps between paychecks.

7    39.    Payday loans are not a new invention; they have been offered for decades. While

8    they have taken many forms, one of the unifying characteristics of payday lending has been that

9    lenders have created different artifices, evolving contractual arrangements, and inventive

10   structures to evade usury caps.

11   40.    In the past, lenders operating in Georgia and elsewhere disguised payday loans as

12   "wage buying," where lenders claimed to be purchasing earned wages, although in reality they

13   were simply issuing loans at usurious rates.

14   41.    Georgia's first major legislative enactment aimed at stopping payday lending was

15   the Industrial Loan Act ("ILA"). The legislation was passed because short-term, high-cost loans

16   trap consumers in a cycle of debt. The cycle perpetuates itself because fees charged in

17   conjunction with payday loans reduce borrowers' paychecks and net pay each period,

18   necessitating borrowers to obtain new loans to cover the shortfall created by the original loans.

19   42.    Notwithstanding the ILA, payday lending made a resurgence in the late 1990s and

20   2000s in newly structured transactions, such as deferred presentments, in which the lender

21   advanced money in exchange for a postdated check, which it agreed not to cash until a specified

22   future date (typically the borrower's next payday).

23   43.    In response to the scourge of "short-term cash advances" making a comeback in

24   Georgia, the Attorney General issued Official Opinion 2002-3 that addressed the practices of

25   "many lenders" who had "developed schemes intended to disguise the true character of the

26   payday loan transaction." The Attorney General observed that "Payday loans have been

27   recognized by many courts, in Georgia and elsewhere, as a pretext for usury" and warned that

28   the then-novel disguised payday loans were illegal under Georgia law.

44.     Notwithstanding the ILA and Attorney General opinion condemning disguised payday lending, the practice persisted in the state. To stop these evasions, in 2004, Georgia enacted the Payday Lending Act ("PLA").

45.     The PLA "encompasses all transactions in which funds are advanced to be repaid at a later date, notwithstanding the fact that the transaction contains one or more other elements." O.C.G.A. § 16-17-1(a). The PLA prohibits lenders from collecting any amounts on payday loans, deems payday loans void and unenforceable, and subjects payday lenders to liability for statutory damages in an amount equal to three times any charges made on an illegal payday loan. *Id.* § 16-17-3.

46.     As history teaches, payday lending is simply too profitable an enterprise for some lenders to resist. EWA products represent the newest generation artifice to attempt to evade Georgia usury law and bilk consumers through a short-term, high-cost payday loan product.

47.     EWA providers' cash-advance loan products (including Empower's) offer cash to borrowers in return for the authorization to debit the borrower's bank account on their payday in an amount equal to the principal cash-advance loan amount and any additional charges.

48.     Defendant's Empower Cash Advance product falls within the scope of the PLA because it is a "transaction[] in which funds are advanced to be repaid at a later date." O.C.G.A. § 16-17-1(a).

## **FACTS**

### **The Earned Wage Product Market and Empower**

**EWA Products Charge High Fees and Wreak Havoc on Borrowers' Financial Health**

49.     A significant driver of demand for consumer credit and financial products stems from the mismatch between when a family receives income and when they pay expenses. Employees generally provide services before being paid for their labor and are typically paid in arrears on a biweekly or semi-monthly cycle. To meet liquidity challenges, consumers have for years turned to credit cards, personal installment loans, and payday loans.

50.     Recently, an old product with new packaging—coined "earned wage access" or "earned wage advance"—has been created and offered to consumers to address the same need.

While marketed as a novel financial technology ("fintech") device, in practice, EWA products are garden variety cash advances.

51.     EWA products provide workers, before their payday, with funds that purport to equal or approximate a portion of their unpaid wages. Loaned funds are repaid via automated withdrawal from the consumer's bank account.

52.     Defendant Empower is one such fintech company that provides an EWA service, which it calls "Empower Cash Advance" or "Empower Advance." The Empower Advance service is a cash advance product: Empower loans customers funds that are repaid on their next payday. "[Empower] Cash Advance is for people who need a little extra cash between paychecks. Empower will float you up to $300 to help you bridge the gap."[19]

53.     To repay these loans, users must link their bank account to their Empower profile and authorize automated debits from their linked external bank account on the scheduled repayment date. If a scheduled repayment is unsuccessful, "Empower may try to collect the payment at a later date."[20]

54.     Empower advertises its cash advance product as "free" and "no interest" while obscuring the ways in which it bilks consumers for fees and other finance charges that add up to loan-shark rates.

55.     Empower is paid through two types of fees: (1) expedite fees, and (2) mandatory subscription fees.

56.     First, **expedite fees** (referred to by Empower as "Instant Delivery Fees") are charged to provide instant access to loan funds. To obtain funds immediately, borrowers must pay an Instant Delivery Fee. If a borrower declines to pay the fee, their cash advance is delivered "up to 2 business days" after funds are requested.

//

---

[19] *Getting a Cash Advance*, EMPOWER, https://support.empower.me/hc/en-us/articles/360039493174-Getting-a-Cash-Advance (last visited Mar. 22, 2025).
[20] *How do I repay Empower my Cash Advance?*, EMPOWER, https://support.empower.me/hc/en-us/articles/13273984410135-How-do-I-repay-Empower-my-Cash-Advance (last visited Mar. 22, 2025).

FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

57.    For Empower Advances, Empower charges:

| Advance amount, $ | Instant Delivery Fee, $ |
|---|---|
| $0-$10.00 | $1.00 |
| $10.01-$49.99 | $2.00 |
| $50.00 - $74.99 | $3.00 |
| $75.00 - $99.99 | $4.00 |
| $100.00 - $149.99 | $5.00 |
| $150.00 - $199.99 | $6.00 |
| $200.00 - $249.99 | $7.00 |
| $250.00 - $299.99 | $8.00 |
| $300 or more | 3% of Advance amount |

*Figure 1*

58.    As shown by the fee schedule above, the amount of the Instant Delivery Fee increases with the size of the loan, similar to interest on traditional loans.

59.    The actual cost to provide customers with instant access to funds is less than $0.05.[21]

60.    The speed of access to funds is an essential and defining aspect of the Empower Cash Advance product. It is designed to address—and marketed as addressing—what is generally a less-than two-week liquidity problem.

61.    Empower's website, app, and marketing include numerous representations about the speed of access to funds, including:

- "Instant Cash. Anytime. Anywhere."
- "Speed: Instant"
- "How instant is instant delivery? 98% of Cash Advances delivered 'instantly' arrive within 15 minutes. Typically faster."
- "Create an account for instant cash and credit."

[21] *Simple, Transparent, Uniform Pricing for All Financial Institutions*, THE CLEARINGHOUSE (showing cost of RTP instant credit transfer at $0.045), available at https://www.theclearinghouse.org/-/media/new/tch/documents/payment-systems/rtp_-pricing_02-07-2019.pdf.

FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

62.    These ads often do not mention whether fees are necessary to obtain cash immediately.

63.    Empower designed a user interface in its app to steer users toward paying expedite fees on each Empower Cash Advance transaction by pre-selecting the fee option. For instance, a user who attempts to obtain an Empower Advance is shown a screen with the instant delivery option preselected. *See infra* ¶ 65, fig. 2.

64.    Empower further encourages users to confirm instant delivery by emphasizing funds are delivered "Within minutes" for the paid option but will take several days if the "Free" option is chosen instead. *See infra* ¶ 65, fig. 2.

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

65.     Empower discourages users from opting out of paying expedite fees by, for example, showing users who choose not to pay a fee an extra screen in the app re-emphasizing the ability to obtain cash immediately with the payment of a fee and allowing users to change back to the fee option with a single click:




*Figure 2*

66.     The necessity for instant access to funds is heightened by the extraordinarily brief loan duration of Empower Advance loans. Indeed, a recent study found that the average loan term for EWA loans provided by five different companies (providing a substantially similar

1   product to Empower Advance) was only 10 days.[22] That term almost certainly holds for

2   Empower since Empower automatically schedules repayments on the payday following the cash

3   advance and the vast majority of its borrowers are paid biweekly.

4           67.     Consumers who cannot wait ten days to access their wages certainly will pay

5   whatever fees an EWA provider charges to obtain their funds as quickly as possible. As a result,

6   the vast majority of EWA users pay expedite fees to obtain immediate funds disbursement.[23]

7           68.     While expedite fees are notionally optional and users can use an EWA product

8   without paying one, they are difficult to access and negate their usefulness to consumers. For

9   instance, the free, non-expedited version of Empower Advance can take "up to 2 business days"

10  for users to receive, while the expedited service takes just a few minutes. This delay is

11  problematic for Empower's intended users, consumers living paycheck to paycheck who turn to

12  Empower for the precise reason that their need for cash is urgent and cannot wait.[24]

13          69.     Turning to the second type of fee, **subscription charges** are monthly fees

14  Empower charges its users for access to Empower Cash Advances.

15  //

16  //

17  //

18  //

19  //

20  //

21

22  [22] Lucia Constantine, Christelle Bamona, Sara Weiss, *Not Free: The Large Hidden Costs of Small-
    Dollar Loans Made Through Cash Advance Apps*, CTR. FOR RESPONSIBLE LENDING, at 10 (Apr.

23  2024) (hereinafter "*Not Free*").
    [23] One recent survey found 79% of EWA users typically paid expedite fees to receive funds faster.

24  *Not Free*, at 3. Likewise, the Consumer Financial Protection Bureau found 96% of fees paid by
    consumers using employer-integrated EWA providers were for expedite fees. Consumer Financial

25  Protection Bureau, Data Spotlight: Developments in the Paycheck Advance Market (July 18,
    2024),          https://www.consumerfinance.gov/data-research/research-reports/data-spotlight-

26  developments-in-the-paycheck-advance-market/.
    [24] On its website, Empower emphasizes the ability of users to use Empower Advance to cover

27  emergencies and provide funds when the borrower is at the point of sale, listing on its website

28  "Real-life moments when our customers used Cash Advance," including "Flat tire," "Grocery
    checkout," "Gas for the car," and "Vet bills."

FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

70.    Empower forces users signing up to its service through its app to agree to an $8.00 monthly subscription to gain access to Empower Cash Advances. Below are a few of the screens Empower shows users while signing up for Empower Advances through the app:



*Figure 3*

71.    At the bottom of Empower's website, Empower mentions the fee (which is charged after a 14-day trial period) as follows:

> Empower offers a 14-day trial for first-time customers only. Once the free trial concludes, Empower charges an auto-recurring $8/month subscription fee. If you do not wish to pay the subscription fee, you must cancel your subscription before the end of your trial. If you are a returning customer, you will be charged the $8 fee immediately upon resubscribing. Cancel any time by visiting "Billing" in the mobile app or contacting help@empower.me.

72.    Subscription fees are presented to users as mandatory fees that must be paid to use the platform and access Empower Cash Advances. There is no mechanism available through

Empower's app to sign up for Empower Advances without agreeing to monthly subscription charges.

73.    The practice of charging mandatory monthly subscription fees to access a cash advance service has been criticized and was the subject of Federal Trade Commission ("FTC") enforcement actions.[25]

74.    The FTC has sued Empower's EWA competitors over their subscription practices in which "few consumers who pay the monthly membership fee are eligible to receive cash advances of up to [the advertised amount of] $250, *many are not eligible to receive cash advances at all*, and those who wish to receive the immediate cash advances they were promised cannot without paying extra."[26] Those allegations apply equally with similar force to Empower and its subscription fees.

75.    Empower admits on its website that "[n]ot everyone will qualify for a Cash Advance." And for those who qualify, the vast majority are offered much less than the max advertised by Empower. Empower Cash Advance maximum offers "range from $10–$300 for first-time customers and $10–$400 for all others. . . . In February 2025, the average offer was $96 for first-time customers and $167 for all others."[27] Only a small fraction of Empower customers are ever offered cash advances of $300.00 or more.

76.    When properly viewing Empower's expedite and subscription fees as costs of credit (*i.e.* finance charges), the APRs for these loans are eye-popping.

//
//
//
//
//

---

[25] *Fed. Trade Comm'n v. Bridge IT, Inc.*, No. 1:23-cv-09651, Compl., ECF No. 1 (S.D.N.Y. Nov. 11, 2023) (hereafter "FTC Compl.").
[26] *Id.* ¶ 2.
[27] *Why Empower Cash Advance*, EMPOWER, https://empower.me/cashadvance/ (last visited Mar. 22, 2025).

FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

77.     A recent study found the average APR imposed by EWA providers is 334%, in line with payday loans:



*Figure 4*

78.     The APR received by Empower for its Cash Advance product is similar and often **much higher**. As discussed *infra*, some of Empower's loans to Plaintiffs had APRs exceeding **1,000%**. *See infra*.

79.     Ironically, Empower and other EWA providers market their products as a low-cost alternative to payday loans.[28] In truth, Empower is a wolf in sheep's clothing: extending loans with APRs nearly identical to the exorbitantly-priced payday loan products it claims to replace.

80.     The EWA "business model capitalizes on most borrowers' financial precarity, and the user interface of these products makes paying a fee . . . difficult to avoid."[29]

81.     Empower's short-term, high-cost lending product traps consumers in cycles of debt, worsens their financial circumstances, leads to more overdraft fees, and an ever-increasing reliance on emergency funds from—and the fees that come with—Empower Advance loans.

---

[28] *Why Empower Cash Advance*, Empower, https://empower.me/cashadvance/ (last visited Mar. 22, 2025) (showing chart purporting to compare Empower Cash Advances to payday loans).
[29] Candice Wang, Lucia Constantine, Monica Burks, Yasmin Farahi, *A Loan Shark In Your Pocket: The Perils of Earned Wage Advance*, CTR. FOR RESPONSIBLE LENDING, at 7 (Oct. 2024) (hereinafter "*Loan Shark*").

FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

82.     An analysis by the Center for Responsible Lending ("CRL") found consumers who used EWA products took out advances repeatedly, with many taking advances on the same day or the day after repayment, and were consequently more likely to overdraft their accounts and be forced to pay overdraft fees. Specifically, the CRL found that 27% of EWA users take out at least 25 loan advances a year, and for 33% of users, the vast majority (80%) of their borrowing is followed by reborrowing within two weeks.[30] This suggests receiving a reduced paycheck (*i.e.*, reduced to pay back EWA loans and fees) necessitated taking out more advances in the following pay period.

83.     Another CRL study found that using EWA products is closely correlated with overdraft fees. "Overdrafts on consumers' checking accounts increased 56% on average after use of an advance product."[31]

**Empower Utilizes Strict Underwriting and Collection Procedures and, Consequently, Almost Always Collects**

84.     While EWA products are financially disastrous for customers, EWA products have proven profitable for the companies offering them. They maximize profits by using exacting underwriting procedures that ensure cash advances, and the fees that accompany them, are timely repaid through automated bank account debits that borrowers authorize when taking out the loans.

85.     "Not everyone [who creates an Empower account and pays subscription fees] will qualify for a Cash Advance."[32] To be eligible for an Empower Advance, borrowers must meet minimum qualifications set by Empower.

86.     To determine whether a borrower is creditworthy, and to decide how much credit to extend in the first place, Empower requires users to connect their accounts to Empower

---

[30] *Loan Shark*, *supra* note 29, at 7.
[31] *Not Free*, *supra* note 22, at 6.
[32] *Why Empower Cash Advance*, EMPOWER.ME, https://empower.me/cashadvance/ (last visited Mar. 23, 2025).

FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

through a third-party service called Plaid.[33] Plaid partners with Empower and other fintech companies to allow them to view borrowers' bank account data. Plaid allows Empower to "[q]uickly verify assets and income" of borrowers, providing "real-time insights into a borrower's income and employment in seconds with a breakdown of earnings from salaries, gig work, and more."[34]

87. Empower uses its real-time insight into customer accounts to ensure borrowers will have sufficient funds to repay their loans on payday and schedule debits for the payday immediately following any given loan, ensuring their loans are paid as soon as funds become available.

88. Empower's underwriting process is detailed and considers many factors. Empower continually adjusts maximum withdrawal amounts depending on the individual's borrowing history and financial health (as gleaned through Plaid). In determining how much credit to extend, Empower "take[s] into consideration a lot of different factors. This can include, but is not limited to, the frequency or amount of your paycheck and your spending habits."[35]

89. In addition, Empower advises users through its app that it considers borrowers':

- "payment history with Empower cash advances"
- "payments on [] debt obligations"
- "transaction history on [] deposit accounts"

90. Empower's underwriting process is both rigorous and continual. Empower says it is "always crunching numbers behind the scenes" to determine whether a borrower qualifies for a cash advance and, if so, how much to offer.[36]

---

[33] Users signing up for an Empower account through the app are shown a screen directing the user to "Link your bank" because, according to Empower, "Bank info is essential in determining your offers."

[34] *Plaid Solutions: Credit*, PLAID.COM, https://plaid.com/solutions/credit/ (last visited Mar. 23, 2025).

[35] *Checking for your Cash Advance qualifications*, EMPOWER.ME, https://support.empower.me/hc/en-us/articles/360049126374-Checking-for-your-Cash-Advance-qualifications (last visited Mar. 23, 2025).

[36] *Why does the amount I am eligible for keep changing?*, EMPOWER.ME, https://support.empower.me/hc/en-us/articles/13298147894295-Why-does-the-amount-I-am-eligible-for-keep-changing (last visited Mar. 23, 2025).

FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

91.     In sum, Empower's underwriting process requires, before any money changes hands, that borrowers: (1) demonstrate they receive regular, consistent income (2) in an amount sufficient to cover existing obligations *and* an Empower Cash Advance; (3) link the bank account to which direct deposits are received to Empower's app through Plaid; (4) authorize Empower to automatically debit the linked accounts on the borrower's payday in an amount equal to the cash advance the borrower receives (the principal loan amount) plus fees; and (5) be current on all prior Empower Cash Advance loans. Borrowers who fail to complete these steps cannot obtain cash advances.

92.     And qualifying for a cash advance is by no means guaranteed. As Empower admits "[n]ot everyone will qualify for a Cash Advance," Empower denies cash advances to a substantial proportion of users who make an account, pay subscription fees, and request a cash advance. That is, after reviewing borrowers' financials, Empower determines many of its customers are not sufficiently credit worthy and declines to offer them Empower Cash Advance access.

93.     For borrowers who qualify, Empower strictly monitors their financial health to determine whether they are eligible and, if so, how much credit to extend based on borrowers' default risk and ability to repay.[37] Through its constant underwriting process, Empower extends loans to borrowers only when it is confident they will repay.

94.     For qualifying borrowers, Empower generally begins by offering relatively low amounts of credit: "the average [Empower Advance] offer was $96 for first-time customers and $167 for all others."

95.     Borrowers obtain greater access to credit—*i.e.*, Empower raises their maximum loan limit—by consistently paying off loans to Empower on time and generally improving their financial health (which Empower monitors through the borrowers' bank balance, spending behavior, repayment history, and income).[38]

---

[37] *Id.* ("We constantly update your eligibility . . . .").
[38] *Why does the amount I am eligible for keep changing?*, EMPOWER.ME, https://support.empower.me/hc/en-us/articles/13298147894295-Why-does-the-amount-I-am-

96.     Empower notably restricts access to its largest loans to a select few of its borrowers. The average cash advance limit for return users was $167 as of February 2025.

97.     These underwriting methodologies—extending credit only to those who will repay, and only in amounts that are likely to be repaid—are precisely the same methods used by traditional lenders. "US credit card lenders individualize interest rates and credit limits according to assessments of customers' default risk."[39] The only distinction—that traditional lenders review credit scores and reports and borrowers' applications to determine creditworthiness while Empower directly reviews borrowers' financial accounts—is one without a difference.

98.     In addition to these loan qualification procedures, borrowers must link multiple repayment methods—including a checking account (that receives a consistent source of directly deposited income) and debit card—to their Empower profile to ensure seamless repayment to qualify for an Empower Advance.

99.     Empower requires borrowers to authorize Empower to initiate a repayment withdrawal via ACH from borrowers' connected checking account or by charging the debit card associated with their Empower profile. If the payment is not successful on that date, Empower is authorized to try to collect the payment at a later date.

---

eligible-for-keep-changing (last visited Mar. 23, 2025) (Q. "Why does the amount I am eligible for keep changing?" A. "Offer amounts change based on your bank account transaction history and repayment activity. We are always crunching numbers behind the scenes to give you the best offer while managing our own risk.."); *Why Empower Cash Advance*, https://empower.me/cashadvance/ (last visited Mar. 23, 2025) ("Offers are based on Empower's eligibility requirements and can increase over time with positive repayment history.").

[39] Matcham, *Risk-Based Borrowing Limits in Credit Card Markets* (Mar. 10, 2015), https://willmatcham.com/img/main_rbbl_matcham_2024_08_15.pdf; *see also* Dey, Mumy, *Determinants of Borrowing Limits on Credit Cards*, FED. RESERVE BANK OF BOSTON (2006), ("Publicly available information about borrowers' creditworthiness helps banks sort their client pool into broad risk classes by way of their credit scoring systems. . . . Profit-maximizing banks choose to provide exactly the amount of credit to their borrowers that maximize their expected profits."), https://www.bostonfed.org/-/media/Documents/events/payment-choice/papers/Dey.pdf; *What are credit limits?*, ARMED FORCES BANK (Apr. 4, 2024) ("Financial institutions grant credit limits that allow you to use credit . . . while ensuring you can manage your payments."), https://www.afbank.com/article/what-are-credit-limits-and-how-are-they-determined.

23

100.    To collect from users with insufficient funds, Empower requires users to authorize Empower to "withdraw small amounts from [borrowers'] Primary Checking Account, until the balance is repaid in full."

101.    Failure to pay back an Empower Advance loan results in suspension of the borrower's Empower until the outstanding balance is paid.

102.    Additionally, if a customer is unable to repay a loan, Empower prevents them from using the product—which cash-strapped customers are usually *dependent on*—until the loan is repaid.

103.    What's more, Empower provides no mechanism for cancelling repayment debits. Once an Empower Cash Advance loan has been taken, the app does not allow users an option to cancel the repayment debit or disconnect their bank account from which repayment is automatically scheduled to be drawn.

104.    Through these underwriting and collections procedures, Empower ensures it will be able to automatically deduct the sum of the cash-advance loan amount (the loan principal), plus any additional charges, from the linked accounts as soon as the borrower's next payday is deposited.

105.    These debt collection methods are so successful that, as Empower's CEO has publicly stated, Empower's "repayment rates are in the high 90%'s. So it looks much more like a traditional near-prime or prime user than it does a subprime user."[40] Empower's high repayment rates are the product of its rigorous underwriting and collections program: "Because we're able to look at your bank account data and your real time information, we're able to [] pick who is in a position to make repayments. And so our loss rates are *very, very low*."[41]

---

[40] *Podcast: Empower's Warren Hogarth: "Giving credit to 100 million people"*, THE TIMES TECH PODCAST, at 35:17 (Sept. 23, 2022), available at https://open.spotify.com/episode/7Bc2nQYmWg106op12YfTsy?si=SKbANbEWQvia8xwPWRrheA&context=spotifs%3Ashow%3A3ygV6nO47HOCuM3fQq3Cap&nd=1&dlsi=920f88c8395e4991 (hereinafter "*Hogarth Podcast*").
[41] *Id.* at 8:45 (emphasis added).

106.    These results are consistent with the EWA industry, according to a recent study which found EWA lenders recoup their advances at least 97% of the time using substantially similar tactics.[42]

**Empower Seeks to Sidestep Laws Applicable to Consumer Credit and Lending Products Through a "Non-Recourse" Claim that is Inconsequential in Practice and is Contradicted by Statements on Empower's App, Website, and from Its CEO**

107.    In a transparent attempt to avoid usury restrictions and other laws and regulations applicable to consumer credit and lending, Empower buries a provision in its terms and conditions stating Empower's cash advance product is "nonrecourse."

108.    This nonrecourse pledge is not meaningfully disclosed to borrowers through Empower's app or website. Indeed, the only place it can be found is buried in small text in the middle of a Terms of Service page spanning more than 8,000 words.

109.    In practice, the nonrecourse provision is functionally inoperative. First, Empower's rigorous underwriting practices and detailed financial review (powered by Plaid) ensure it only lends to borrowers who can repay on their next payday. Second, Empower has cultivated a borrower base comprised of users living paycheck to paycheck who, by virtue of their prior cash advance usage, are dependent on repeat borrowing (and therefore can't afford to avoid repayment and lose access to future borrowing). Third, Empower's automated collections (*i.e.*, pre-authorized repayment debits) process is extremely effective and allows Empower to process repayment as soon as funds are available.

110.    Empower is financially motivated to collect on all the cash advances it lends. Empower is a for-profit corporation and has designed a cash advance product that maximizes customer payment of fees *and* collection of fees and principal when its loans mature. And it has been successful in its collections process with a "repayment rate[] in the high 90%s" and a "very, very low" loss rate. *See supra*.

---

[42] Devina Khanna and Arjun Kaushal, *Earned Wage Access and Direct-to-Consumer Advance Usage Trends*, FIN. HEALTH NETWORK (April 2021) at 2, available at https://cfsi-innovation-files-2018.s3.amazonaws.com/wp-content/uploads/2021/04/26190749/EWA_D2C_Advance-_sage_Trends_FINAL.pdf.

FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

111. Empower closely tracks "loss rates" and "repayment rates" with the purpose of minimizing borrower defaults and collecting the money it has lent.

112. What's more, Empower makes myriad representations that the money it lends is "owed," "due," and is lent based on the agreement and understanding it will be repaid. For example, when a cash advance is extended, Empower shows borrowers screens regarding the "Repayment due" date and, similarly, the "due date" to repay the advance:



*Figure 5*

//
//
//
//
//
//
//
//
//
//

FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

113.    Empower also characterizes the amount owed by the borrower on outstanding loans as the "Total to repay" and the "$[dollar amount] Outstanding:"




*Figure 6*

114.    In addition, Empower prominently uses words synonymous with loans and consumer credit (albeit misleadingly) in advertisements to consumers. For instance, it claims on its website that Empower Cash Advances come with "No interest," "No credit checks," and "No late fees." Likewise, Empower describes its cash advance service as "0% interest." Terms like "interest," "0%" and "credit check" are plainly credit-related terms, further supporting that Empower Advance is a consumer credit product.

115.    Finally, Empower's CEO has publicly declared Empower is in the credit business and its Empower Advance product is functionally a credit product. For instance, he has noted

"Empower's mission is to solve access to credit."[43] To fulfill that mission, Empower "underwrite[s] people based on their bank account data rather than their credit score."[44] As noted above, Empower reviews its borrowers' financials directly and "if we're [Empower] able to see that more or less you're doing the right thing, then we extend you a small amount of credit."[45]

116.    In sum, Empower and its customers enter Empower Advance transactions with an agreement and expectation the cash advanced (plus fees) will be repaid, facilitated by automated repayment debits scheduled to be drawn on the borrowers' next payday, which are not cancellable through the Empower app. Consequently, Empower's loans are repaid nearly 100% of the time. The "nonrecourse" provision buried in Empower's terms serves only one genuine function: as pretextual support for Empower to argue to judges and regulators that Empower Advance is not credit in order to avoid usury laws and regulations.

**Empower Likens Its Cash Advance Product to a Product it Expressly Concedes is Credit**

117.    The substance of Empower's cash advance transactions demonstrate the advances are consumer credit. Empower Advance is presented and functions precisely as a loan, as described *supra*.

//
//
//
//
//
//
//
//
//
//

---

[43] *Hogarth Podcast*, *supra* note 40, at 4:10.
[44] *Id.* at 7:30.
[45] *Id.* at 8:00.

FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

118.    That aside, Empower itself likens the Empower Advance product to a product it concedes *is* credit. Specifically, Empower promotes its "Thrive" credit product in its app as follows: "Picture Cash Advance, supercharged!"



*Figure 7*

119.    Thrive is described as a $200–$400 line of credit. Like Empower Advance, Thrive allows borrowers to receive cash from Empower directly to their connected bank account and repay later. Over time, borrowers can receive additional credit from Empower by timely repaying cash extended. Thrive thus functions identically to Empower Advance, hence Empower is correct to describe Thrive as: "Picture Cash Advance, supercharged!"

### Empower's Loans to Plaintiffs

120.    PO Vickery is currently an active-duty petty officer stationed at Naval Air Station North Island ("NASNI") in Coronado, California.

121.    He has been an active duty servicemember since February of 2023 and will remain on active duty until at least February 2028.

122.    Sgt. Fuller is currently an active servicemember in the U.S. Army stationed at

FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

Fort Stewart in Georgia.

123.    She has been an active duty servicemember since 2018 and will remain on active duty until at least 2027.

124.    Empower extended consumer credit to Plaintiffs in the form of Empower Cash Advance transactions like those discussed above.

125.    PO Vickery and Sgt. Fuller used the loans from Empower for personal, family, or household purposes.

126.    PO Vickery and Sgt. Fuller paid Empower's finance charges, in the form of Instant Delivery Fees and subscription charges, to obtain cash-advance loans from Empower.

127.    A small selection of Empower Advance loans made by Empower to PO Vickery (and accompanying Instant Delivery Fees and subscription fees) are shown in the below table, with the cost of credit and APR included:

*Table 1*

| Date | Principal Amt. | Subscription Fees[46] / Instant Delivery Fees / Total | Loan Period | APR |
|---|---|---|---|---|
| 9/29/24–10/2/24 | $100.00 | $4.00 / $5.00 / $9.00 | 3 days | 1,095% |
| 10/3/24–10/9/24 | $200.00 | $4.00 / $7.00 / $11.00 | 6 days | 335% |
| 1/1/25–1/10/25 | $100.00 | $4.00 / $5.00 / $9.00 | 9 days | 365% |

//

//

//

//

//

//

---

[46] Monthly subscription fees were included in the calculation by dividing the monthly fee by the number of advances Plaintiffs took out in the month in question. *See* 32 C.F.R. § 232.4(c)(1)(iii)(C).

128.    A small selection of Empower Advance loans made by Empower to Sgt. Fuller (and accompanying Instant Delivery Fees and subscription fees) are shown in the below table, with the cost of credit and APR included:

*Table 2*

| Date | Principal Amt. | Subscription Fees / Instant Delivery Fees / Total | Loan Period | APR |
|---|---|---|---|---|
| 10/30/24–11/12/24 | $75.00 | $4.00 / $4.00 / $8.00 | 13 days | 299% |
| 1/27/25–2/7/25 | $75.00 | $4.00 / $4.00 / $8.00 | 11 days | 354% |
| 2/27/25–3/6/25 | $100.00 | $4.00 / $5.00 / $9.00 | 7 days | 469% |

129.    Plaintiffs have received dozens of usurious loans from Empower since they started using the service. For much of the relevant period, Plaintiffs took out a loan each pay period and were forced to take out *another loan* immediately after repayment of their last loan.

130.    The fees attendant to the loans (including, *inter alia*, Instant Delivery Fees and subscription fees) are immediately and directly connected to Empower's extensions of credit to Plaintiffs.

131.    Further, Empower's credit agreement required Plaintiffs to purportedly waive their right to a jury trial and waive their right to participate in a class action in violation of 10 U.S.C. § 987(e)(2).

132.    Empower's credit agreement also failed to include mandatory MLA loan disclosures in violation of 10 U.S.C. § 987(c) and TILA.

**CLASS ACTION ALLEGATIONS**

133.    PO Vickery and Sgt. Fuller seek to represent three classes of individuals pursuant to Fed. R. Civ. P. 23.

//

//

//

//

FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

134.    Plaintiffs seek to represent the proposed "MLA Class" and the "TILA Class"; and Sgt. Fuller seeks to represent the "Georgia Class" (collectively the "Classes"), which are defined as follows:

> **MLA Class**: All Covered Members and dependents of Covered Members who entered into an agreement with Empower to use its "Empower Cash Advance" (or substantially similar) product, in which Empower was paid a finance charge (including, without limitation, an instant transfer fee or subscription charge).

> **TILA Class**: All Covered Members, dependents of Covered Members, and Georgia residents that entered into an agreement with Empower to use its "Empower Cash Advance" (or substantially similar) product, in which Empower was paid a finance charge (including, without limitation, an instant transfer fee or subscription charge).

> **Georgia Class**: All Georgia residents that entered into an agreement with Empower to use its "Empower Cash Advance" (or substantially similar) product, in which Empower was paid a finance charge (including, without limitation, an instant transfer fee or subscription charge).

135.    Expressly excluded from the Classes are: (a) any Judge presiding over this action and members of their families; (b) Empower and any entity in which Empower has a controlling interest, or which has a controlling interest in Empower, and its legal representatives, assigns and successors; and (c) all persons who properly execute and file a timely request for exclusion from the Classes.

136.    Plaintiffs reserve the right to amend the Class definitions if further investigation and discovery indicates that the Class definitions should be narrowed, expanded, or otherwise modified.

137.    **Numerosity.**  Empower's scheme has harmed and continues to harm the members of the Classes. The members of the proposed Classes are so numerous that joinder of all members is impracticable.

138.    The exact number of Class members is unknown, but Empower has made millions of loans, and Plaintiffs estimate there are, at least many thousands of consumers in the MLA Class, TILA Class, and Georgia Class. As a result, Plaintiffs believe that the total Classes each number in (at least) the thousands, thus members of the Classes are so numerous that joinder of all class members is impracticable.

139. **Commonality**. Common questions of law and fact affect the rights of each Class member and common relief by way of damages is sought for Plaintiffs and Class members.

140. The harm that Empower has caused or could cause is substantially uniform with respect to Class members. Common questions of law and fact that affect the Class members include, but are not limited to:

- Whether Plaintiffs and the MLA Class members are Covered Members subject to the protections and limitations of the MLA;

- Whether Empower is a "creditor" subject to the protections and limitations of the MLA;

- Whether Empower's loans constitute an extension of "consumer credit" subject to the protections and limitations of the MLA and TILA;

- Whether Empower entered into standard form loan agreements with Covered Members;

- Whether Empower's loans exceed the MLA statutory rate cap of 36% MAPR;

- Whether Empower failed to provide required credit disclosures in violation of the MLA;

- Whether Empower's standard form loan agreements contain a class action waiver, jury trial waiver, or arbitration clause in violation of the MLA;

- Whether Empower failed to provide required credit disclosures in violation of the MLA and TILA;

- Whether Empower used a method of access to a deposit, savings, or other financial account maintained by the borrower as security for an obligation in violation of the MLA.

- Whether each month Empower charged interest to Plaintiffs and Class Members it restarted the statute of limitations under the MLA;

- Whether each month that Plaintiffs and the Class Members paid money to Empower it restarted the statute of limitations under the MLA;

- Whether Defendant made loans (as that term is understood under O.C.G.A. § 16-17-2) to Sgt. Fuller and the Georgia Class;

- Whether Defendant's loans exceeded the Georgia statutory usury cap;

- Whether Class members are entitled to actual or statutory damages for the aforementioned violations and, if so, in what amounts;

- Whether Empower should be enjoined from continuing its lending practices in the manner challenged herein;

- Whether Empower is subject to punitive damages, and, if so, the proper measure of such damages and remedies to which Plaintiffs and the MLA Class are entitled under 10 U.S.C. § 987(f)(5); and

- Any declaratory and/or injunctive relief to which the Classes are entitled.

141. **Typicality**. The claims and defenses of Plaintiffs are typical of the claims and defenses of the MLA Class because Plaintiffs are Covered Members and their loan agreements with Empower are typical of the type of personal, household, or family loans that Empower normally provides to Covered Members and their dependents. Additionally, Empower uses the same or substantially similar standard form loan agreement in all of its lending transactions. The documents involved in the transactions were standard form documents and the violations are statutory in nature.

142. For similar reasons, the claims and defenses of Plaintiffs are typical of the claims and defenses of the TILA Class and the claims of Sgt. Fuller are typical of the claims and defenses of the Georgia Class. Plaintiffs suffered damages of the same type and in the same manner as the Classes they seek to represent. There is nothing peculiar about Plaintiffs' claims. Plaintiffs have no interests antagonistic to the interests of the other members of the Classes.

143. **Adequacy**. Plaintiffs will fairly and adequately assert and protect the interests of the Classes. Plaintiffs have hired attorneys who are experienced in prosecuting class action claims and will adequately represent the interests of the Classes, and Plaintiffs have no conflict of interest that will interfere with maintenance of this class action.

144. **Predominance**. The previously articulated common issues of fact and law

predominate over any question solely affecting individual Class Members. Resolution of the common issues in this litigation will resolve virtually the entirety of every Class Members' claims in a single stroke. There are no significant individual questions of liability or damages whatsoever, and certainly not ones that predominate over issues common to the Classes. Thus, predominance within the meaning of Rule 23(b)(3) is established.

145.    **Superiority**. A class action provides a fair and efficient method for the adjudication of this controversy. There are no unusual legal or factual issues that would create manageability problems; Prosecution of thousands of separate actions by individual members of the Classes would create a risk of inconsistent and varying adjudications against Empower and could create incompatible standards of conduct;  Adjudications with respect to individual members of the Classes could, as a practical matter, be dispositive of any interest of other members not parties to such adjudications, or substantially impair their ability to protect their interests; and the claims of the individual Class members are small in relation to the expenses of litigation, making a class action the only procedural method of redress in which Class members can, as a practical matter, vindicate their legal claims and enforce their statutory rights.

146.    Empower has acted and refused to act on grounds generally applicable to the Classes, thereby making declaratory relief and corresponding final injunctive relief under Federal Rule of Civil Procedure 23(b)(2) appropriate with respect to the Classes. Empower should be enjoined from making loans to Covered Borrowers, their dependents, and Georgia residents in violation of the MLA, TILA, and PLA and a declaration should be made that the loans are void from inception.

## COUNT I
## VIOLATIONS OF MILITARY LENDING ACT

147.    Plaintiffs re-allege and incorporate by reference herein the allegations set forth in the paragraphs 1–146 above.

148.    The MLA prohibits a creditor from obligating a "Covered Member" or dependent of a Covered Member (collectively, "Covered Members") to a loan in excess of 36% MAPR.

149.    A "Covered Member" under the statute is a "member of the armed forces who is

1 on active duty under a call or order that does not specify a period of 30 days or less."

2     150.   "The MAPR is the cost of the consumer credit expressed as an annual rate." 32

3 C.F.R. § 232.3. The MAPR includes as relevant here, "finance charges associated with the

4 consumer credit" and "[a]ny fee imposed for participation in any plan or arrangement for

5 consumer credit." 32 C.F.R. § 232.4.

6     151.   Plaintiffs and the MLA Class Members are "Covered Members," subject to the

7 protections and limitations imposed by the MLA. A Covered Member is a consumer who, at the

8 time the consumer becomes obligated on a consumer credit transaction or establishes an account

9 for consumer credit, is a Covered Member of the armed forces or a dependent of a Covered

10 Member (as defined in 32 CFR 232.3(g)(2) and (g)(3)).

11     152.   PO Vickery and Sgt. Fuller are considered "Covered Members" with respect to

12 their Empower loan agreements because they are active duty service members who are obligated

13 by law to repay loans they took out for personal, family or household purposes.

14     153.   Empower is a "creditor" subject to the requirements and limitations imposed by

15 the MLA in that it engages in the business of extending consumer credit to Covered Members

16 protected by the MLA. 10 U.S.C. § 987(i)(5); also 32 C.F.R. § 232.3(i).

17     154.   The underlying loan transactions at issue in this case constitute "consumer credit"

18 subject to the protections and limitations imposed by the MLA because they are "credit offered

19 or extended to a Covered Member primarily for personal, family, or household purposes,"

20 subject to a finance charge and outside the ambit of any of the identified exceptions. 32 C.F.R. §

21 232.3(f)(1)(i); also 10 U.S.C. § 987(i)(6).

22     155.   Empower charged Plaintiffs and the MLA Class well above the 36% interest rate

23 cap on their loans, in violation of the MLA.

24     156.   Empower fails to make all the disclosures required by 10 U.S.C. § 987(c)(1)(A)

25 and 32 C.F.R. § 232.6 in its standard form loan agreements, in violation of the MLA.

26     157.   Empower's standard form loan agreements include mandatory arbitration

27 agreements in violation of 10 U.S.C. § 987(e)(3).

28     158.   Empower's standard form loan agreements include class action waivers trial

1    waivers in violation of 10 U.S.C. § 987(e)(2).

2        159.    Empower's standard form loan agreements use a check or other method of access

3    to a deposit, savings, or other financial account maintained by the borrower as security for an

4    obligation in violation of 10 U.S.C. § 987(e)(5).

5        160.    As a result, Empower violates 10 U.S.C. § 987.

6        161.    Accordingly, pursuant to 10 U.S.C. § 987(f)(5), on behalf of the MLA Class,

7    Plaintiffs seek an order from the Court awarding statutory damages in the amount of $500 per

8    violation, actual and punitive damages, along with injunctive relief pursuant to 10 U.S.C. §

9    987(f)(5)(A).

10        162.    Plaintiffs are entitled to an award of attorneys' fees and costs pursuant to 10

11    U.S.C. § 987(f)(5)(B).

12        WHEREFORE, Plaintiffs pray for relief as set forth below.

13                            **COUNT II**
                  **VIOLATIONS OF THE TRUTH IN LENDING ACT**
14

15        163.    Plaintiffs re-allege and incorporate by reference herein the allegations set forth in

16    the paragraphs 1–146 above.

17        164.    TILA and Regulation Z require creditors to provide consumers with specified

18    disclosures for closed-end credit transactions. 15 U.S.C. § 1638; 12 C.F.R. §§ 1026.17, 1026.18.

19    Empower's loan agreements are closed-end credit transactions because they are not open-end

20    credit transactions. Open-end credit transactions are "a plan under which the creditor reasonably

21    contemplates repeated transactions, which prescribes the terms of such transactions, and which

22    provides for a finance charge which may be computed from time to time on the outstanding

23    unpaid balance." 15 U.S.C. § 1602.

24        165.    Among other requirements, the Regulation prescribes the format of the

25    disclosures, as well as disclosure of certain terms themselves, such as the annual percentage rate

26    and finance charge. 12 C.F.R. §§ 1026.17, 1026.18.

27        166.    Empower is a creditor whose financing qualifies as "credit" under TILA and

28    Regulation Z, and its loan agreements with consumers are therefore subject to TILA and

1  Regulation Z's disclosure requirements. See 12 C.F.R. § 1026.2(a)(14).

2      167.    Empower has not provided such disclosures before consummation of the loan

3  agreements.

4      168.    Empower failed to provide such disclosures to Plaintiffs and the TILA Class.

5      169.    As a result, Empower violated TILA and Regulation Z. 15 U.S.C. § 1638; 12

6  C.F.R. §§ 1026.17 & 1026.18.

7      170.    Accordingly, pursuant to 15 U.S.C. § 1640, on behalf of the TILA Class,

8  Plaintiffs seek an order from the Court awarding actual damages and statutory damages and

9  attorneys' fees and costs.

10     WHEREFORE, Plaintiffs pray for relief as set forth below.

11                                  **COUNT III**
                   **VIOLATIONS OF THE GEORGIA PAYDAY LENDING ACT**
12

13     171.    Plaintiff Fuller re-alleges and incorporates by reference herein the allegations set

14  forth in the paragraphs 1–146 above.

15     172.    Plaintiff Fuller brings this claim individually and on behalf of the Georgia Class.

16     173.    Empower is engaged in the business of making, offering, arranging, or acting as an

17  agent in the making of loans of $3,000.00 or less. O.C.G.A. § 16-17-2(a), (b).

18     174.    Empower is not a bank or credit union and is not licensed under any Georgia law

19  to engage in that business.

20     175.    Empower does not meet any of the statutory exceptions to the general prohibition

21  against the making of loans of $3,000.00 or less. See O.C.G.A. § 16-17-2(a)(1)-(4).

22     176.    Plaintiff Fuller and the Georgia Class are borrowers residing in Georgia who

23  obtained cash-advance loans from Empower and paid interest and other charges in connection with

24  those loans.

25     177.    Empower advanced funds to Plaintiff Fuller to be repaid at a later date.

26     178.    Empower's conduct described herein violated and continues to violate the PLA,

27  which means that the loans of Plaintiff Fuller and the Georgia Class were void ab initio, that

28  Empower is barred from collecting any amounts on those loans, and that Defendant is additionally

FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

liable to Plaintiff Fuller and the members of the Georgia Class for three times the amount of any interest or other charges, and attorneys' fees and costs. *See* O.C.G.A. § 16-17-3.

179.    Accordingly, Plaintiff Fuller, individually and on behalf of the Georgia Class, requests: (i) payment of all principal of any loans repaid in the last 20 years; (ii) payment of triple the amount of any fees, or other amounts repaid in the last 20 years; (iii) a declaration that Plaintiff Fuller's and the Georgia Class members' loans are void ab initio; (iv) and an order prohibiting Defendant from attempting to debit Plaintiff Fuller's or the Georgia Class members' bank accounts to repay any cash advances.

WHEREFORE, Plaintiff Fuller prays for relief as set forth below.

## **PRAYER FOR RELIEF**

WHEREFORE, on behalf of the Classes, Plaintiffs pray for judgment against Empower as follows:

A. Certifying this action as a class action as provided by Fed. R. Civ. P. 23, appointing PO Vickery and Sgt. Fuller as Class Representatives, and appointing undersigned attorneys as Class Counsel;

B. Declaring that Empower violated the MLA and adjudging that PO Vickery, Sgt. Fuller, and MLA Class Members' standard form loan agreements violate the MLA;

C. Adjudging that Empower violated the MLA and awarding PO Vickery, Sgt. Fuller, and MLA Class Members actual damages of not less than $500 per violation pursuant to 10 U.S.C. § 987(f)(5)(A)(i);

D. Adjudging that Empower violated TILA and awarding PO Vickery, Sgt. Fuller and the TILA Class actual damages and statutory damages pursuant to 15 U.S.C. § 1640;

E. Adjudging that Empower violated the MLA and award PO Vickery, Sgt. Fuller, and MLA Class Members punitive damages pursuant to 10 U.S.C. § 987(f)(5)(A)(ii);

F. An order awarding the members of the Classes actual, statutory, treble, and all other damages available by law, with pre- and post-judgment interest;

G. An order providing Plaintiffs and the members of the Classes restitution for any principal, interest, fees, or other charges paid to Defendant;

H.  An order declaring the cash advances that Plaintiffs and the Classes obtained were or are void ab initio;

I.  An order preventing Defendant from attempting to collect its cash advances from Plaintiffs and the Class members;

J.  Awarding PO Vickery, Sgt. Fuller, and the Classes, reasonable attorneys' fees and costs incurred in this action;

K.  Enjoining Empower from continuing to engage in predatory lending practices in violation of the MLA, TILA, and PLA;

L.  Awarding PO Vickery, Sgt. Fuller, and the MLA Class, any pre-judgment and post judgment interest as may be allowed under the law; and

M.  Awarding such other and further relief as the Court may deem just and proper.

Dated:  July 7, 2025                    Respectfully submitted,

CONN LAW, PC

*/s/ Elliot Conn*
Elliot Conn
*Attorneys for Plaintiffs Samuel Vickery, Rae Fuller, and the Proposed Classes*

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury of each and every cause of action so triable.


Dated: July 7, 2025                    Respectfully submitted,


                                       CONN LAW, PC


                                       */s/ Elliot Conn*
                                       Elliot Conn

                                       *Attorneys for Plaintiffs Samuel Vickery, Rae Fuller,
                                       and the Proposed Classes*

FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND