**MAYER BROWN LLP**
Archis A. Parasharami
aparasharami@mayerbrown.com
575 Market Street, Suite 2500
San Francisco, CA 94105
Telephone: (415) 874-4230

*Attorney for Defendant Empower Finance, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| SAMUEL VICKERY and RAE FULLER, individually, on behalf of all others similarly situated, and on behalf of the general public,<br><br>Plaintiffs,<br><br>v.<br><br>EMPOWER FINANCE, INC. d/b/a EMPOWER,<br><br>Defendant. | Case No. 25-CV-3675-JSC<br><br>Assigned to the Hon. Jacqueline Scott Corley<br><br>**DEFENDANT EMPOWER FINANCE, INC.'S REPLY IN SUPPORT OF MOTION TO COMPEL ARBITRATION AND TO STAY LITIGATION**<br><br>Date:      October 2, 2025<br>Time:     10:00 A.M.<br>Location: Courtroom 8, 19th Floor |

## TABLE OF CONTENTS

**Page**

ARGUMENT .... 2

I. The Military Lending Act Does Not Apply .... 2

A. An Empower Cash Advance is not an extension of "credit" because there is no repayment obligation. .... 2

1. The actual terms of the Cash Advance transaction control. .... 3

2. Empower's Cash Advance is not a secured "non-recourse" transaction of the type described by plaintiffs. .... 6

B. Empower's Cash Advance product is not subject to any finance charge and is therefore not subject to the MLA. .... 8

1. Plaintiffs apply an incorrect legal standard. .... 8

2. Empower's subscription fees and instant transfer fees are not incident to or a condition of the extension of credit. .... 10

II. Even If The MLA Applies, Plaintiffs' TILA And GPLA Claims Should Be Arbitrated And The Case Stayed. .... 13

CONCLUSION .... 14


# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Carrington Mortg. Servs., LLC*,
23 F.4th 370 (4th Cir. 2022)........................................................................................ 12

*Cal. Pawnbrokers Ass'n v. Carter*,
2016 WL 6599819 (E.D. Cal. Nov. 7, 2016) ........................................................................ 7

*CFPB v. MoneyLion Techs. Inc.*,
2025 WL 893684 (S.D.N.Y. Mar. 24, 2025) ..................................................................9, 10

*CFPB v. Snap Fin. LLC*,
2024 WL 3625007 (D. Utah Aug. 1, 2024) ........................................................................... 3

*CompuCredit Corp. v. Greenwood*,
565 U.S. 95 (2012)........................................................................................................ 13

*Cox v. Cmty. Loans of Am., Inc.*,
2014 WL 1216511 (M.D. Ga. Mar. 24, 2014) ........................................................................ 7

*Espin v. Citibank, N.A.*,
126 F.4th 1010 (4th Cir. 2025)..................................................................................... 13

*Fin. Freedom Acquisition, LLC v. Std. Bank & Tr. Co*,
43 N.E.3d 911 (Ill. 2015) ................................................................................................. 7

*Foster v. Equity Key Real Est. Invs. LP*,
2017 WL 1862527 (N.D. Cal. May 9, 2017) ....................................................................4, 10

*Glover v. Ocwen Loan Servicing, LLC*,
127 F.4th 1278 (11th Cir. 2025)................................................................................... 12

*Golubiewski v. Activehours, Inc.*,
2025 WL 2484192 (M.D. Pa. Aug. 28, 2025) ........................................................................ 9

*Gonzalez v. Specialized Loan Servicing*,
691 F. Supp. 3d 1162 (C.D. Cal. 2023)............................................................................. 7

*Household Credit Servs., Inc. v. Pfennig*,
541 U.S. 232 (2004)........................................................................................................ 9

*Johnson v. ActiveHours, Inc.*,
2025 WL 2299425 (D. Md. Aug. 8, 2025)........................................................................4, 5

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)...................................................................................................... 12

*McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*,
    145 S. Ct. 2006 (2025) .................................................................................................. 12

*Orubo v. ActiveHours, Inc*,
    2025 WL 1257695 (N.D. Cal. Apr. 30, 2025) ................................................................ *passim*

*Steines v. Westgate Palace, LLC*,
    113 F.4th 1335 (11th Cir. 2024) ..................................................................................... 14

*In re Taberna Preferred Funding IV, Ltd.*,
    594 B.R. 576 (Bankr. S.D.N.Y. 2018) .............................................................................. 7

*Turner v. E-Z Check Cashing, Inc.*,
    35 F. Supp. 2d 1042 (M.D. Tenn. 1999) ........................................................................... 5

*Veale v. Citibank, F.S.B.*,
    85 F.3d 577 (11th Cir. 1996) ........................................................................................... 11

**Statutes**

10 U.S.C. § 987 ........................................................................................................... 2, 8, 13

15 U.S.C. § 1692 .............................................................................................................. 12

Md. Code Ann., Com. Law § 12-301 ................................................................................. 5

**Other Authorities**

12 C.F.R. § 1026 ................................................................................................... 2, 6, 8, 10

12 C.F.R. § 226.4 ................................................................................................................ 8

32 C.F.R. § 232 ................................................................................................................... 2

80 Fed. Reg. 43560 (Jul. 22, 2015) ................................................................................. 3, 7

*Truth in Lending*, 61 Fed. Reg. 49237, 49239 (Sept. 19, 1996) ......................................... 9

*Truth in Lending*, 68 Fed. Reg. 16185, 16187 (Apr. 3, 2003) .......................................... 11

*Truth in Lending*, 67 Fed. Reg. 72618 (Dec. 6, 2002) ..................................................... 12

Plaintiffs do not deny that they agreed to arbitrate or that their arbitration agreements cover the claims in this case. Instead, they resist enforcement of their arbitration agreements solely by arguing that the Military Lending Act ("MLA") applies to Empower's Cash Advance product.[1] As Empower explained in its opening brief, plaintiffs are wrong for two independently sufficient reasons. *First*, Empower does not extend "credit" through its Cash Advance product within the meaning of the MLA because there is no legal or contractual obligation to repay an advance. Mem. 11-13. Plaintiffs acknowledge (Opp. 11) that "credit" under the MLA requires a "debt," and that a "debt" in turn requires a repayment obligation. Here, that fundamental characteristic of any debt— an obligation to repay—is not present. The absence of a repayment obligation is legally dispositive and should end the inquiry. *Second*, even assuming the Cash Advance product qualified as an extension of credit, it is neither subject to a finance charge nor payable by installments, and therefore does not meet the MLA's definition of "consumer credit." *Id.* at 13-15.

Plaintiffs' arguments to the contrary do not meaningfully grapple with the *undisputed evidence* Empower has submitted about how the Cash Advance product operates, including the contract terms themselves and uncontested declarations describing the nature of the product. Plaintiffs instead rely heavily on the allegations in their complaint, but despite plaintiffs' invocation of Rule 12(b)(6) pleading standards (Opp. 7), *this is not a Rule 12(b)(6) motion*. In the context of a motion to compel arbitration, the Court cannot accept plaintiffs' allegations as true in the face of contrary evidence—which plaintiffs do not challenge, much less attempt to contradict. Plaintiffs also urge the Court to ignore the actual contract terms, accept their characterizations of the Cash Advance product, and rely on case law (mostly arising entirely in the Rule 12(b)(6) context) that is inapposite, unpersuasive, or both.

The Court should reject those invitations. The MLA does not apply to plaintiffs' transactions with Empower, and the Federal Arbitration Act therefore requires enforcement of plaintiffs' arbitration agreements.

---

[1] Empower recently rebranded and now does business as "Tilt Finance, Inc." To avoid confusion, we continue to use the name "Empower" for purposes of this motion.

# ARGUMENT

## I. The Military Lending Act Does Not Apply.

The MLA's arbitration prohibitions apply only if there is an "extension of consumer credit" to a "covered member" by a "creditor." Mem. 10; *see* 10 U.S.C. §§ 987(e)(3), (f)(4). Those conditions haven't been met, for two main reasons: (1) Empower does not extend "credit" through its Cash Advance product; and (2) Empower's Cash Advance product is not subject to any finance charge and therefore is not subject to the MLA.

### A. An Empower Cash Advance is not an extension of "credit" because there is no repayment obligation.

The parties agree that "credit" for purposes of the MLA is defined as "the right to defer payment of *debt* or to incur *debt* and defer its payment." 12 C.F.R. § 1026.2(a)(14); 32 C.F.R. § 232.3(h) (emphasis added); *see* Mem. 11; Opp. 11. The parties further agree that neither the MLA nor the regulations define "debt," so that term should be given its ordinary meaning under dictionary definitions and case law. *See* Mem. 11-12; Opp. 11. And the parties also agree that the ordinary meaning of "debt" requires a repayment *obligation*. Mem. 11-12; Opp. 11 (both citing, *e.g.*, Black's Law Dictionary).

Despite that common starting point, plaintiffs (citing their complaint) insist that they "were 'liable' to pay 'a specific sum of money' that was 'outstanding' to Empower on the 'due date.'" Opp. 11 (quoting Am. Compl. ¶¶ 98-103, 112-113). But saying it does not make it so, and plaintiffs' position is impossible to square with the terms of their actual contracts. Those terms make clear that Empower users "have *no unconditional obligation to repay* any Empower Advance. Consequently, we warrant to you that we have *no contractual or legal claim against you* for an Empower Advance." Haller Decl. Ex. 5 at 4 (emphases added). Plaintiffs also do not contest Empower's evidence that Empower users are free to disconnect their linked bank account at any time if they do not want to repay the advanced amount to Empower. *See* Murray Decl. ¶ 13; Mem. 3. Notably, the CFPB has recognized the viability of this option.[2]

---

[2] *See* CFPB, *How do I stop automatic payments from my bank account?* ("You have the right to stop a company from taking automatic payments from your account, even if you previously allowed

That option is also borne out in the reality of how Empower users interact with the platform. For example, data from 2024 show that approximately one in every three consumers who obtained an advance in the first quarter of that year either revoked their bank authorization or otherwise did not pay Empower the amount of at least one advance within 180 days. Decl. of Dominic Quaranta ¶ 3.

In an effort to downplay the actual terms of their transactions as "form-over-substance" (Opp. 1), plaintiffs make two types of arguments. First, they argue that it does not matter to the creation of a "debt" whether the contract creates a legal or contractual obligation to repay an advance. Second, they attempt to analogize Empower's Cash Advance to very different types of transactions—namely, secured transactions involving collateral that the lender can take to enforce the repayment obligation. Both arguments are deeply misguided.

### 1.     The actual terms of the Cash Advance transaction control.

Plaintiffs urge the Court to disregard the actual contract terms as "functionally inoperative" and instead focus on what they describe as the "'economic substance'" of the transaction. Opp. 16 (citing *Orubo v. ActiveHours, Inc.*, 2025 WL 1257695, at *5 (N.D. Cal. Apr. 30, 2025)).

But that is an invitation to commit the very error that the CFPB made in *CFPB v. Snap Fin. LLC*, 2024 WL 3625007 (D. Utah Aug. 1, 2024) (discussed at Mem. 12-13). As the court in *Snap* held, under TILA and Regulation Z, it is the "*formal terms* of the" contract that control whether a transaction meets the statutory definition of "credit," not a plaintiff's allegations about the "practical operation" of that contract. *Id.* at *8 (emphasis added). Plaintiffs say that *Snap* "dealt with different claims" than TILA or the MLA. Opp. 16. But that's inaccurate; the CFPB had alleged a violation of TILA, which is why the relevant discussion in the opinion addressed "[w]hether the CFPB has stated a claim under the CFPA, EFTA, and *TILA* . . . under those statutes' shared definition" of "credit." *Id.* at *5 (emphasis added). And the MLA borrows from TILA and Regulation Z. *See* Mem. 10-11 (citing Limitations on Terms of Consumer Credit Extended to Service Members and Dependents, 80 Fed. Reg. 43560, 43560 (July 22, 2015)).

them."), https://www.consumerfinance.gov/ask-cfpb/how-do-i-stop-automatic-payments-frommy-bank-account-en-2023/ (last accessed August 27, 2025).

Plaintiffs' arguments also fail on their own terms. For example, they rely on their allegations that most Empower users pay the advanced funds back to Empower. Opp. 14 & n.9. As discussed above, that allegation is overstated, because a significant number of users do not pay back an advance. Quaranta Decl. ¶ 3. But in addition, the likelihood that an advance will be repaid is not, by itself, sufficient to transform a product with no repayment obligation into an extension of credit. *See Foster v. Equity Key Real Est. Invs. LP*, 2017 WL 1862527, at *4 & n.2 (N.D. Cal. May 9, 2017) (cited at Mem. 11-12) (noting the absence of a "certain" or "absolute[]" repayment obligation was dispositive). Plaintiffs note that *Foster* involved an investment contract that is expressly excluded from Regulation Z (Opp. 15), but that was not relevant to the question the *Foster* court was addressing: whether the option contract at issue in that case was indeed an investment contract or instead a loan in disguise. 2017 WL 1862527, at *3. Plaintiffs' attempted distinction thus pays short shrift to the court's core holding that the option contract was not a disguised loan within the meaning of TILA because the likelihood of repayment is different from—in dispositive ways—the creation of an actual obligation to repay. *Id.* at *4 & n.2. The same is true of Empower's Cash Advance product.

Plaintiffs also miss the mark in noting that Empower offers other products, such as Empower Thrive, that do qualify as credit, and in trying to pick out of context the word "credit" from a podcast by Empower's founder discussing Empower's suite of products more broadly. Opp. 4. Neither point addresses Empower's Cash Advance product in particular, and the parties agree that the Cash Advance product is the only type of transaction at issue here. Because the contract terms make clear that there is no legal or contractual obligation to repay an advance, there is no extension of "credit," and the MLA does not apply.

For these reasons, *Orubo* and the recent similar decision in *Johnson v. ActiveHours, Inc.*, 2025 WL 2299425 (D. Md. Aug. 8, 2025) (involving the same defendant), are unpersuasive. Both decisions inexplicably failed to address the plain meaning of "debt" as requiring a legal or contractual repayment obligation, which is in turn critical to qualifying as "credit" within the

meaning of TILA and Regulation Z. *See* Mem. 11-12, 15-16.[3] And because they were deciding the issue in the context of a Rule 12(b)(6) motion, those courts were required to accept the factual allegations in the complaint as true and did not have before them record evidence explaining the actual characteristics of the transactions. That is not the case here.

Moreover, those courts, like plaintiffs here (Opp. 11-12), attempted to analogize the cash advance transactions to deferred presentment transactions, a type of payday loan. But as Empower discussed in its brief (at 15-16), deferred presentment transactions are a type of loan that create an *unconditional obligation to repay*. As plaintiffs recognize (Opp. 12), in a deferred presentment transaction, the customer must issue a check that covers both repayment of the principal and a service fee. And plaintiffs' own cited case involving a deferred presentment transaction confirms the distinction, noting that the plaintiff was under a contractual obligation to "repay the face amount on the check," an obligation that the plaintiff could defer only by incurring additional service fees. *Turner v. E-Z Check Cashing, Inc.*, 35 F. Supp. 2d 1042, 1046 (M.D. Tenn. 1999). Indeed, the lender in that case invoked its contractual right to cash the check when the plaintiff failed to repay the funds and declined to continue deferring payment and incurring additional service fees. *Id.*

Here, by contrast, Empower's Terms provide no mechanism by which Empower can recover the advance if a customer elects to cancel their payment authorization and chooses not to repay the advanced funds. Access to an Empower customer's bank account is available for only as long as a user grants Empower access. Further, a user is free to revoke this authorization at any time or close the connected bank account without breaching their contract or incurring legal liability to Empower, unlike in deferred presentment transactions. These characteristics of the Cash Advance product make clear that users of that product are under no legal or contractual obligation to repay Empower.

Nor, unlike in deferred presentment transactions, do Empower users incur any additional fees every month that a payment is deferred or "rolled over." *Turner*, 35 F. Supp. 2d at 1046

---

[3] The portion of *Johnson* addressing the definition of a "loan" under a Maryland statute is even further afield. That law defined a "'loan'" to include *any* "'advance of money,'" which the court noted does not include any "repayment requirement." 2025 WL 2299425, at *4-5 (quoting Md. Code Ann., Com. Law § 12-301). The definition of "credit" under the MLA or TILA is not so expansive.

(plaintiff accumulated $840 in service fees on a $300 deferred presentment transaction by deferring payment for over eight months). Plaintiffs do not dispute, nor could they, Empower's unrebutted evidence showing that a user does not incur any fees or charges for declining to repay the advance, and that users who do repay their advances are not subject to any late fees or interest. Mem. 12; Haller Decl. ¶ 4; Murray Decl. ¶ 13.

Finally, plaintiffs' reliance (Opp. 15) on Federal Reserve Board commentary to Regulation Z badly misses the mark. That commentary does not address whether TILA applies to a product that creates no legal or contractual obligation to repay; rather, it states that creditors must disclose "the credit terms to which the parties are legally bound at" the outset of the transaction, even if "a term or contract may later be deemed unenforceable by a court on the basis of equity or other grounds." 12 C.F.R. pt. 1026, Supp. I, ¶ 5(c)(1). In other words, the commentary reflects the common-sense point that a contract that purports to create a "legal obligation" (*id.*) to repay can trigger TILA's requirements even if the contract is later deemed unenforceable in court. That's a far cry from the situation here, where the contract expressly *disclaims*, rather than purports to *create*, any repayment obligation.

### 2. Empower's Cash Advance is not a secured "non-recourse" transaction of the type described by plaintiffs.

The critical characteristic of a transaction creating "debt" is the legal or contractual obligation to repay. Attempting to pivot away from the reality that there is no obligation to repay an Empower Cash Advance, plaintiffs instead argue that it doesn't matter whether a debt is "recourse" or "non-recourse." Opp. 13-15. It's true that the specific label describing the debt does not matter; what matters is whether there is an obligation to repay. Remarkably, plaintiffs neglect to mention that all of the transactions they describe as "non-recourse" are *secured* transactions that create a repayment obligation *that the lender can enforce through the collateral provided as security*. Nothing of the sort is present here; there is no obligation to repay an Empower Cash Advance at all. And the transactions are not secured in any way; unlike in the examples plaintiffs provide, Empower users do not provide Empower with any money or property that Empower has the legal or contractual right to take away if the user fails to repay the advanced funds.

As one of plaintiffs' cited cases makes clear, "nonrecourse" in the context of the examples they cite "describes a type of debt that is 'of, relating to, or involving an *obligation that can be satisfied only out of the collateral securing the obligation* and not out of the debtor's other assets.'" *In re Taberna Preferred Funding IV, Ltd.*, 594 B.R. 576, 586 (Bankr. S.D.N.Y. 2018) (quoting Black's Law Dictionary (10th ed. 2014)) (emphasis added). For example, plaintiffs cite a case involving a reverse mortgage, a transaction in which the creditor has "recourse" available "against the property itself"—in other words, the reverse mortgage lender has the legal and contractual right to enforce the borrower's obligation to repay by foreclosing on the property securing the loan. *Fin. Freedom Acquisition, LLC v. Std. Bank & Tr. Co*, 43 N.E.3d 911, 918 (Ill. 2015) (cited at Opp. 14-15). *Gonzalez v. Specialized Loan Servicing* (cited at Opp. 15) is similar: that case held that a secured mortgage transaction was subject to TILA even after the plaintiff discharged his personal debts in bankruptcy because the lender retained a "security interest" in the property itself that it could use to enforce the repayment obligation. 691 F. Supp. 3d 1162, 1170-71 (C.D. Cal. 2023). As the court noted, "[a] security interest cannot exist *without an underlying obligation*." *Id.* at 1170 (quotation marks omitted; emphasis added). Yet an underlying obligation to repay—or, for that matter, a security interest—is completely absent here.

Plaintiffs' remaining cases involve pawnbroker transactions, transactions in which the borrower must "pledge[] or sell[] an item to a pawnbroker creditor in return for a sum of money." *Cox v. Cmty. Loans of Am., Inc.*, 2014 WL 1216511, at *7 (M.D. Ga. Mar. 24, 2014); *see also Cal. Pawnbrokers Ass'n v. Carter*, 2016 WL 6599819, at *3 (E.D. Cal. Nov. 7, 2016) (both cited at Opp. 14). But in those transactions, like mortgages, there is an obligation to repay the funds that is secured by the property pledged as collateral for the transaction—if the borrower does not repay, they forfeit the property to the pawnbroker. *See Cox*, 2014 WL 1216511, at *8 ("If a specific sum of money is not paid, then the *Plaintiff loses [the item]*.'") (emphasis added).

In addition, in 2015 the Department of Defense issued a rule extending the MLA to cover pawnbroker transactions. *See Cal. Pawnbrokers Ass'n*, 2016 WL 6599819, at *3 (citing 80 Fed. Reg. 43560, 43561-43562, 43568-43569 (Jul. 22, 2015)). There has been no comparable expansion of the MLA to cover products like Empower's Cash Advance—i.e., unsecured cash advance

products with no repayment obligation—and the DOD's 2015 rule would have been unnecessary if plaintiffs' overbroad interpretation of what counts as "credit" under the MLA were correct.

In sum, Empower's Cash Advance product is not "credit" under the MLA. Because the MLA does not apply for that reason, the Court's inquiry can stop there and the Court should enforce plaintiffs' arbitration agreements under the FAA.

**B.    Empower's Cash Advance product is not subject to any finance charge and is therefore not subject to the MLA.**

If the Court nonetheless reaches plaintiffs' arguments about Empower's subscription fee and instant transfer fee, it should conclude that the MLA does not apply because those fees are not finance charges. *See* Mem. 13-15.[4] Plaintiffs' arguments to the contrary misstate the governing legal standard and mischaracterize the nature of those fees.

**1.    Plaintiffs apply an incorrect legal standard.**

Plaintiffs first assert that any "cost elements" of a transaction, including any "fees" or "service charges," qualify as "finance charges" under the MLA. Opp. 17-18. To reach that incorrect conclusion, they first note that "interest" under the *ordinary* meaning of the term is an example of a "finance charge" under Regulation Z. 12 C.F.R. § 226.4(b)(1). They then point to a *separate* "expansive" statutory definition of "interest" in the MLA (Opp. 18) that includes all "cost elements" of a transaction in the calculation of the military annual percentage rate of interest ("MAPR") for that transaction. 10 U.S.C. § 987(i)(3); *see id.* § 987(b) (prohibiting a MAPR exceeding 36%).

But the MLA's definition of "interest" for purposes of calculating the MAPR does not determine what qualifies as "consumer credit" under the statute; plaintiffs cannot mix and match provisions from Regulation Z and the MLA to create broader definitions of "consumer credit" and "finance charge" that are nowhere to be found in TILA, Regulation Z, or the MLA. Instead, the governing definition of "finance charge" is found in Regulation Z itself: the fee or charge must be imposed "as an incident to or a condition of the extension of credit." 12 C.F.R. § 1026.4(a); *see*

---

[4] Plaintiffs concede that an Empower Cash Advance is not payable in installments (Opp. 17), so the only relevant issue to whether the product qualifies as "consumer credit" under the MLA is whether it is subject to a finance charge.

Mem. 13. As we discuss below, the fees to which plaintiffs refer are not "incident to" or "a condition of" the "extension of credit."

Plaintiffs' reliance on *CFPB v. MoneyLion Techs. Inc.*, 2025 WL 893684 (S.D.N.Y. Mar. 24, 2025) (cited at Opp. 17-18) is misplaced for the same reasons. The issue in *MoneyLion* was whether membership fees imposed by a lender issuing installment loans should be included in the calculation of the MAPR, not whether the lender was an issuer of "consumer credit" in the first place within the meaning of the MLA, TILA, or Regulation Z. *Id.* at *4-5, *9-13. Indeed, the court made clear that "the cost elements included in the MAPR calculation" are "*more expansive* than those included under TILA and Regulation Z" (*id.* at *12 (emphasis added))—undermining plaintiffs' efforts to conflate the two for purposes of defining "consumer credit."

Plaintiffs fare no better in relying on a sentence in Federal Reserve Board commentary to Regulation Z stating that "[e]ven though a lender may not require a particular loan feature, the feature may become a term of the credit if it is included." Opp. 18 (quoting *Truth in Lending*, 61 Fed. Reg. 49237, 49239 (Sept. 19, 1996)) (emphasis omitted). The Federal Reserve Board was referring to features that "alter[] the fundamental nature of the borrower's repayment obligation." 61 Fed. Reg. at 49239. Indeed, the very next sentence after the one plaintiffs quote states that "[f]or example, borrowers obtaining variable-rate loans may have an option to convert the loan to a fixed interest rate at a subsequent date." *Id.* Changes to the borrower's interest rate are a far cry from optional fees that do not affect the terms of the underlying transaction.

Finally, plaintiffs filed a notice of supplemental authority (Dkt. No. 33) pointing to the recent decision in *Golubiewski v. ActiveHours, Inc.*, 2025 WL 2484192 (M.D. Pa. Aug. 28, 2025) (*Golubiewski II*), which reversed course from the court's prior decision concluding that "expedite fees" were not finance charges under TILA and Regulation Z and instead followed the decision in *Orubo*. The court concluded that a finance charge must have a "necessary connection" to the issuance of credit, not be a "necessary condition" to that credit. *Golubiewski v. Activehours, Inc.*, 2025 WL 2484192, at *6 (M.D. Pa. Aug. 28, 2025) (citing *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 240-41 (2004)). Empower agrees that at minimum a "*necessary* connection" is required under *Pfennig* (*see* Mem. 16-17 & n.5), but for the reasons discussed in Empower's

opening brief and below, the two fees plaintiffs address are not "necessary" and therefore do not meet that standard.

**2.    Empower's subscription fees and instant transfer fees are not incident to or a condition of the extension of credit.**

Neither of the two fees plaintiffs point to—a subscription fee and an instant transfer fee—meets the definition of a "finance charge," because neither is charged "as an incident to or a condition of" an Empower Cash Advance.

**Subscription Fee**. Empower submitted undisputed evidence with its motion explaining that users pay the subscription fee to access the whole suite of products and services offered by Empower, including evidence showing that a large number of users pay the subscription fee without ever obtaining an advance. *See* Mem. 13-14; Haller Decl. ¶¶ 5-7. That evidence completely undermines any assertion that the subscription fee is "incident to" the cash advance product.

What is more, even if plaintiffs were correct that a subscription fee is linked to obtaining a cash advance from Empower (*see* Opp. 18 & n.15), Regulation Z specifically excludes from the definition of "finance charge" "fees charged for participation in a credit plan, whether assessed on an annual or other periodic basis." 12 C.F.R. § 1026.4(c)(4).[5] And for that reason, plaintiffs' reliance on *MoneyLion* (Opp. 18) is again misplaced. The MLA explicitly *includes* participation fees in the MAPR calculation, but such fees are explicitly *excluded* from the controlling definition of "finance charge" under Regulation Z. *See MoneyLion*, 2025 WL 893684, at *12.

**Instant Transfer Fee**. Plaintiffs do not dispute that the instant transfer fee is optional and does not affect whether Empower will extend an advance or the amount of that advance. *See* Mem. 14; Murray Decl. ¶ 12. Instead, plaintiffs argue that the fee is necessary for "*instant* access to cash advances." Opp. 18 (emphasis added); *see id.* at 19 (fee is "unavoidable [for] receiving cash *instantly*") (emphasis added). But that circular reasoning simply assumes plaintiffs' preferred conclusion—that instant access to the advanced funds fundamentally changes the nature of the underlying transaction.

---

[5] The staff commentary to Section 1026.4(c) clarifies that the exclusion for "participation fees" is not limited to credit card plans, but rather applies to "any credit plan in which payment of a fee is a condition of access to the plan itself." *See* FRB Official Staff Commentary, 2022 WL 10222390.

Plaintiffs' assumption that an optional fee for expediting an advance fundamentally alters the nature of the underlying transaction cannot be squared with the Eleventh Circuit's decision in *Veale v. Citibank, F.S.B.*, 85 F.3d 577 (11th Cir. 1996) (discussed at Mem. 14) holding that a voluntary expedited mailing charge was not a "finance charge" because it was voluntary and did not affect the substance of the underlying refinancing transaction. *Id.* at 579. Plaintiffs attempt to distinguish *Veale* on the ground that the funds from the refinancing transaction in that case were sent to third-party creditors rather than retained by the borrower (Opp. 21), but that is a distinction without a difference. The core of the court's holding did not turn on who received the loan proceeds, but rather that "the borrower can choose to avoid the Federal Express fee by having the documents sent via regular mail" and the borrowers in *Veale* "could have chosen not to pay the Federal Express fee and the bank did not require it" to issue the loan proceeds. *Veale*, 85 F.3d at 579. All of the same points are true of the instant transfer fee here.

Plaintiffs' position also cannot be squared with the Federal Reserve Board's treatment of voluntary fees charged to expedite delivery of a credit card, which allow cardholders quicker access to funds that can be drawn on a credit card account. The Federal Reserve Board has issued a rule concluding that such optional fees are not incident to the extension of credit and therefore are not finance charges under TILA and Regulation Z, particularly where the same card could be obtained for free via standard delivery. *Truth in Lending*, 68 Fed. Reg. 16185, 16187 (Apr. 3, 2003). As the Board put it, "a fee for expedited delivery of a credit card is not incidental to the extension of credit and thus is not a finance charge where the consumer requests the service and *the card is also available by standard mail service* (or another means that is at least as fast) without a fee." *Id.* (emphasis added). Analogous to *Veale* and this Federal Reserve Board rule, Empower's Cash Advance product is available by default within a few business days; an optional amount that a consumer decides to pay to expedite access to the funds is not a finance charge.

Plaintiffs rely heavily on *Orubo* and cases following it, but as Empower explained in its brief (at 15-19), *Orubo* is unpersuasive for several reasons, including that there was no basis for the court's conclusion that the optional expedite fee in that case was "effectively mandatory." *Orubo*, 2025 WL 1257695, at *7. Indeed, unlike here, evidence about the nature of the fee was not

before the court in *Orubo*, because the procedural posture of the opinion—a Rule 12(b)(6) motion—required the court to accept the complaint's allegations as true.

It is further notable that plaintiffs do not rebut our showing that the *Orubo* court erred for several reasons in relying on a 2024 Proposed Interpretive Rule issued by the CFPB, including that under Supreme Court precedent the court was required to interpret the statute itself. *See* Mem. 19 (citing *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 145 S. Ct. 2006, 2015 (2025); *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024)). Plaintiffs instead protest only that the court in *Orubo* did not defer to or rely on the CFPB's proposed interpretive rule (Opp. 22), but that attempt to downplay the significance of the proposed interpretive rule to the *Orubo* court's decision cannot be squared with the decision itself, which directly quoted the rule in concluding that express fees are "finance charges." *Orubo*, 2025 WL 1257695, at *7.

Finally, the Fair Debt Collection Practices Act cases plaintiffs cite (at Opp. 9) involving convenience fees for making loan payments online or over the phone are irrelevant. These cases shed no light on what counts as a "finance charge" under TILA and Regulation Z that is "incident[] to" the extension of credit; on the contrary, the relevant provision of the FDCPA applies to "*any amount*" charged. 15 U.S.C. § 1692f(1) (emphasis added); *see also Glover v. Ocwen Loan Servicing, LLC*, 127 F.4th 1278, 1283, 1287-91 (11th Cir. 2025) (holding that "any amount" is not limited only to amounts "incidental to the principal obligation"); *Alexander v. Carrington Mortg. Servs., LLC*, 23 F.4th 370, 376, 377 n.2 (4th Cir. 2022) (noting that the court did not need to reach the issue of whether convenience fees are "incidental" because the statute covers "any" amounts charged). In the context of TILA and Regulation Z, by contrast, the Federal Reserve Board has concluded that an optional "fee charged for expediting a consumer's payment would *not* appear to be incidental to the extension of credit if this payment method is not established as the regular payment method for the account." *Truth in Lending*, 67 Fed. Reg. 72618, 72618 (Dec. 6, 2002) (emphasis added).

Because Empower's fees are not "finance charges," the MLA does not apply and does not prevent enforcement of plaintiffs' arbitration agreements.

## II. Even If The MLA Applies, Plaintiffs' TILA And GPLA Claims Should Be Arbitrated And The Case Stayed.

Even if the Court were to conclude that plaintiffs' MLA claims are not subject to arbitration, the Court should stay litigation of those claims pending resolution of arbitration of their non-MLA claims.

Plaintiffs do not deny that the Court has discretion to stay the resolution of non-arbitrable claims pending the outcome of arbitration and that the facts and theories of liability on their non-MLA claims are largely intertwined with their MLA claims, which counsels in favor of a stay. *See* Mem. 19-20.

Instead, plaintiffs argue only that when the MLA applies, it precludes arbitration of "any dispute" involving "consumer credit," no matter the cause of action. Opp. 9-10 (citing 10 U.S.C. §§ 987(f)(3)-(4)). But "consumer credit" has a specific meaning under the MLA that is subject to specific limitations (10 U.S.C. § 987(e)(3)), and the language in the MLA's prohibition of arbitration (which covers "any dispute involving the extension of consumer credit," *id.* § 987(f)(4)) should likewise be limited to MLA-specific claims. A more expansive interpretation would improperly read into the MLA an intent to displace arbitration of claims under *other* statutes— statutes that do not contain the "contrary congressional command" required to displace the FAA. *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012).

That is why, for example, in a recent case involving both MLA and non-MLA claims, the Fourth Circuit ordered the district court to *compel* arbitration of all *non-MLA* claims, while leaving open on remand only the application of the MLA's arbitration prohibitions to the *MLA* claims. *Espin v. Citibank, N.A.*, 126 F.4th 1010, 1019-20 (4th Cir. 2025). Specifically, the Fourth Circuit "remand[ed] *with instructions to compel arbitration in accordance with the terms of the parties' arbitration agreements*, not only with respect to plaintiffs' [Servicemembers Civil Relief Act] claims but also with respect to *all other claims except those brought under the MLA*." *Id.* at 1019 (emphases added). Plaintiffs' suggestion that the Fourth Circuit's remand left open potentially broader application of the MLA's arbitration prohibition (Opp. 9-10) is thus incorrect and cannot be squared with what the Fourth Circuit actually said.

Finally, *Steines v. Westgate Palace, LLC*, 113 F.4th 1335 (11th Cir. 2024) (cited at Opp. 9) offers plaintiffs no assistance. In *Steines*, the plaintiff's *only* claim was under the MLA (*id.* at 1338-39, 1341), and therefore the court had no occasion to address whether the MLA would prohibit enforcement of an agreement to arbitrate claims under other statutes.

## CONCLUSION

The Court should enter an order (i) compelling plaintiffs to arbitrate their claims individually in accordance with their arbitration agreements; and (ii) staying this action pending the outcome of arbitration.

Dated: September 8, 2025                                   Respectfully submitted,

By: */s/ Archis A. Parasharami*
Archis A. Parasharami
*aparasharami@mayerbrown.com*
MAYER BROWN LLP
575 Market Street, Suite 2500
San Francisco, CA 94105
Telephone: (415) 874-4230

*Attorney for Defendant Empower Finance, Inc.*

14
DEFENDANT EMPOWER FINANCE, INC.'S REPLY ISO MOTION TO COMPEL ARBITRATION
AND TO STAY LITIGATION; CASE NO. 25-CV-3675-JSC