UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAMUEL VICKERY and RAE FULLER, individually, on behalf of all others similarly situated, and on behalf of the general public,<br><br>Plaintiffs,<br><br>v.<br><br>EMPOWER FINANCE, INC. d/b/a EMPOWER,<br><br>Defendant. | Case No. 25-cv-03675-JSC<br><br>**ORDER RE: MOTION TO COMPEL ARBITRATION AND STAY LITIGATION**<br><br>Re: Dkt. No. 26 |

Plaintiffs' putative class action alleges Empower's short-term cash advance product violates federal and Georgia lending statutes. (Dkt. No. 22.)[1] Now pending before the Court is Empower's motion to compel arbitration and stay litigation. (Dkt. No. 26.) Having carefully considered the parties' submissions, and with the benefit of oral argument on October 2, 2025, the Court DENIES Empower's motion to compel arbitration. Based on the undisputed record Empower is a creditor extending consumer credit to covered borrowers under the Military Lending Act ("MLA"). So, the arbitration agreement between Empower and Plaintiffs is unenforceable.

**BACKGROUND**

**I.    RELEVANT FACTS**

Empower, a financial technology company, offers an "earned wage access" program called Cash Advance. (Dkt. No. 22 ¶ 2; Dkt. No. 26-3 ¶ 3.) Through Empower Cash Advance, Empower offers workers funds approximating all or a portion of their unpaid wages before their

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

1    payday, and workers give Empower permission to collect repayment of the advance plus any fees
2    on the workers' next payday.  (Dkt. No. 22 ¶¶ 51-53.)  In its website, app, and marketing,
3    Empower advertises its "instant" cash advances.  (*Id.* ¶ 61.)
4         To receive an advance, a user must register for an Empower account and then link their
5    bank account so Empower can decide whether the user is creditworthy and how large an advance
6    to extend.  (*Id.* ¶ 86; Dkt. No. 26-8 at 5.)  Users also "give Empower permission to initiate a
7    withdrawal" from their bank accounts or charge their debit card "for the amount of the Empower
8    Advance plus any applicable tip amount or delivery fee" when users receive their next paycheck.
9    (Dkt. No. 26-8 at 5.)  Empower then advances funds to users and schedules users' repayment for
10   their following payday.  (Dkt. No. 22 ¶ 87.)  If users' bank accounts have sufficient funds,
11   Empower may withdraw the full amount owed; otherwise, Empower may "withdraw small
12   amounts . . . until the balance is repaid in full."  (Dkt. No. 26-8 at 5.)
13        Empower's Terms of Service specify Cash Advances are offered "on a non-recourse
14   basis," and users have "no unconditional obligation to repay."  (Dkt. No. 26-8 at 5.)  Empower
15   also disclaims any "contractual or legal claim" and promises it will "not engage in debt collection
16   activities, place the amount advanced with or sell to a third party, or make any reports to credit
17   reporting agencies" regarding the Advance.  (*Id.*)  Users can contact Empower customer support to
18   "withdraw their authorization to pay back a Cash Advance through their linked bank account."
19   (Dkt. No. 26-2 ¶ 13.)  Empower attests "of users who obtained a cash advance in the first quarter
20   of 2024, 33% had an Empower advance in 2024 where they either revoked their bank
21   authorization or did not pay Empower the amount of at least one such advance within 180 days."
22   (Dkt. No. 34-1 ¶ 3.)  However, Empower "reserve[s] the right to deny [] access to Empower
23   Advance if [users] . . . do not repay the full balance of an Empower Advance."  (Dkt. No. 26-8 at
24   5.)  Ultimately, according to Empower's CEO, "repayment rates are in the high 90%'s."  (Dkt. No.
25   22 ¶ 105.)
26        Empower charges two types of fees.  First, following a 14-day free trial, users must pay a
27   Subscription Fee of $8 per month to use Empower's mobile application.  (Dkt. No. 26-3 ¶ 6.)  The
28   mobile application provides access to Cash Advance alongside other tools "to help [users] save

money, monitor their budgets, notify users of updates like missed payments and bank fees, and track their credit scores." (*Id.* ¶¶ 3, 5.) Some users pay the Subscription Fee without ever seeking a cash advance. (*Id.* ¶ 7.) Second, Cash Advance users can choose to, rather than receive an advance in about one business day, pay an Instant Delivery Fee to receive the advance in minutes. (Dkt. No. 26-8 at 5; Dkt. No. 22 ¶ 56.) The amount of the Instant Delivery Fee increases with the size of the loan. (Dkt. No. 26-8 at 5; Dkt. No. 22 ¶¶ 57-58.)

## II. PROCEDURAL HISTORY

In March 2025, U.S. Navy Petty Officer Samuel Vickery, a California resident, filed a putative class action in the California Superior Court for the County of San Francisco and alleged Empower charges fees that violate the MLA, 10 U.S.C. § 987, et seq., and the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, et seq. (Dkt. No. 1-1; Dkt. No. 22 ¶ 13.) Empower removed the case to this Court and moved to compel arbitration. (Dkt. Nos. 1, 18.)

Plaintiffs then filed an amended complaint, which added U.S. Army Sergeant Rae Fuller, a Georgia resident, as a named plaintiff and alleged additional claims under the Georgia Payday Lending Act ("GPLA"), O.C.G.A. § 16-17-2, et seq. (Dkt. No. 22 at 2, ¶ 14.) Together, Plaintiffs seek to represent three classes:

> **MLA Class**: All [United States active-duty service members ("Covered Members")] and dependents of Covered Members who entered into an agreement with Empower to use its "Empower Cash Advance" (or substantially similar) product, in which Empower was paid a finance charge (including, without limitation, an instant transfer fee or subscription charge).
> **TILA Class**: All Covered Members, dependents of Covered Members, and Georgia residents that entered into an agreement with Empower to use its "Empower Cash Advance" (or substantially similar) product, in which Empower was paid a finance charge (including, without limitation, an instant transfer fee or subscription charge).
> **Georgia Class**: All Georgia residents that entered into an agreement with Empower to use its "Empower Cash Advance" (or substantially similar) product, in which Empower was paid a finance charge (including, without limitation, an instant transfer fee or subscription charge).

(*Id.* ¶ 134.) Given Plaintiffs' amended complaint, the Court dismissed Empower's motion to compel arbitration without prejudice. (Dkt. No. 25.) Empower moved again to compel arbitration. (Dkt. No. 26.)

3

## III. RELEVANT FACTS RE: AGREEMENT

To access Empower's Cash Advance product, users must register on Empower's mobile application. (Dkt. No. 26-2 ¶¶ 3, 5.) The application first prompts users to enter their phone number and asks them to enter a one-time six-digit code delivered by text message. (*Id.* ¶¶ 5-6.) Before August 2023, users were shown the following message directly above where they entered the six-digit code: "You agree to our Privacy Policy, Terms, E-Sign & Subscription Agreement." (*Id.* ¶ 6.) Each underlined phrase included a hyperlink to Empower policies. (*Id.*) Once users entered the code, they could register with Empower. (*Id.* ¶¶ 7-9.)

Empower's records show Sargeant Fuller registered on Empower's mobile application on June 4, 2021, and Petty Officer Vickery registered on June 5, 2022. (Dkt. No. 26-3 ¶¶ 14-15.) On June 4, 2021, the Terms linked to Empower's Terms of Service, which included: "You agree that any and all disputes or claims that have arisen or may arise between you and Empower . . . will be resolved exclusively through final and binding arbitration, rather than a court." (*Id.* ¶¶ 8-9; Dkt. No. 26-4 at 13.) And on June 5, 2022, the Terms linked to revised Terms of Service including the same language. (Dkt. No. 26-3 ¶¶ 9-10; Dkt. No. 26-5 at 8.)

Empower last updated its Terms of Service on February 6, 2025. (Dkt. No. 26-3 ¶ 12.) The current Terms of Service state: "You agree that any and all disputes or claims that have arisen or may arise between you and us . . . will be resolved exclusively through final and binding arbitration, rather than a court." (Dkt. No. 26-8 at 8.) On February 19, 2025, Empower sent an email to its users, including named Plaintiffs, which stated:

> We have also made updates to our **Terms of Service**, **including an updated arbitration agreement**, such that we can provide you with one consolidated Terms of Service that govern your interactions with all Empower and Petal branded products and services.
> **By continuing to use our products and services you agree to these updated terms.**

(Dkt. No. 26-3 ¶ 13; Dkt. No. 26-9 at 2.) Empower's records show Sargeant Fuller received a Cash Advance on May 24, 2025, and Petty Officer Vickery received Cash Advances on April 30, 2025; May 13, 2025; May 30, 2025; June 14, 2025; June 28, 2025; July 3, 2025; July 12, 2025; and July 26, 2025. (Dkt. No. 26-3 ¶¶ 15-16.)

4

**DISCUSSION**

The Federal Arbitration Act ("FAA") governs arbitration agreements "evidencing a transaction involving commerce." 9 U.S.C. § 2. Such agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *Id.* In resolving a motion to compel arbitration under the FAA, "a court's inquiry is limited to two gateway issues: (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Lim v. TForce Logistics, LLC*, 8 F.4th 992, 999 (9th Cir. 2021) (quotation marks and citation omitted). "If both conditions are met, the FAA requires the court to enforce the arbitration agreement in accordance with its terms." *Id.* (cleaned up).

The party seeking to compel arbitration "bears the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Johnson v. Walmart Inc.*, 57 F.4th 677, 681 (9th Cir. 2023). Empower attests, and Plaintiffs do not dispute, Plaintiffs agreed to binding arbitration provisions in Empower's Terms of Service when registering for Empower accounts and by continuing to obtain Cash Advances after Empower's February 19, 2025 email. Plaintiffs also do not dispute the Terms of Service require arbitration of "any and all disputes or claims," and thus encompass Plaintiffs' MLA, TILA, and GPLA claims. (Dkt. No. 26-4 at 13; Dkt. No. 26-5 at 8; Dkt. No. 26-8 at 8.)

Instead, Plaintiffs argue the MLA prohibits enforcement of any arbitration agreement.

**I.   ARBITRATION OF MLA CLAIMS**

"Although the FAA imposes 'a liberal policy favoring arbitration agreements' that 'requires courts to enforce agreements to arbitrate according to their terms,' its mandate can be 'overridden by a contrary congressional command.'" *Laver v. Credit Suisse Secs. (USA), LLC*, 976 F.3d 841, 845 (9th Cir. 2020) (quoting *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012)). "The burden rests on the party challenging arbitration 'to show that Congress intended to preclude a waiver of a judicial forum' for the claims at issue." *Ziober v. BLB Resources, Inc.*, 839 F.3d 814, 817 (9th Cir. 2016) (quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991)). "Such congressional intent 'will be discoverable in the text of the [statute], its legislative

5

history, or an inherent conflict between arbitration and the [statute's] underlying purposes.'" *Id.* (quoting *Gilmer*, 500 U.S. at 26).

The MLA protects members of the armed forces on active duty or active Guard and Reserve Duty ("Covered Members") and their dependents from certain lending practices. *See* 10 U.S.C. §§ 987(a), (i)(1)-(2). To do so, the MLA imposes restrictions and obligations on "creditor[s] who extend[] consumer credit to a covered member of the armed forces or a dependent of such a member." *Id.* § 987(a). Under the MLA, "[i]t shall be unlawful for any creditor to extend consumer credit to a covered member with respect to which . . . the creditor requires the borrower to submit to arbitration." *Id.* § 987(e)(3); *see also id.* § 987(f)(4) ("[N]o agreement to arbitrate any dispute involving the extension of consumer credit shall be enforceable against any covered member or dependent of such a member, or any person who was a covered member or dependent of that member when the agreement was made.").

Plaintiffs argue, and Empower does not dispute, the MLA overrides the FAA by deeming "unlawful" creditors' extensions of consumer credit to covered members which "require[] the borrower to submit to arbitration." *Id.* § 987(e)(3); *see also Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 514 (2018) ("Congress has [] shown that it knows how to override the Arbitration Act when it wishes—by explaining, for example, . . . that requiring a party to arbitrate is 'unlawful' in other circumstances." (quoting 10 U.S.C. § 987(e)(3))).

Instead, Empower argues the MLA does not prohibit arbitration because Empower is not a "creditor [] extend[ing] consumer credit." 10 U.S.C. § 987(e)(3). The MLA directs the U.S. Department of Defense ("DOD") to define "creditor" and "consumer credit." *Id.* §§ 987(h)(2)(D); 987(i)(5)-(6). Under DOD regulations, a "creditor" is a person "[e]ngaged in the business of extending consumer credit." 32 C.F.R. § 232.3(i)(1). Consumer credit, in turn, is "credit offered or extended to a covered borrower primarily for personal, family, or household purposes, and that is: (i) Subject to a finance charge; or (ii) Payable by a written agreement in more than four installments." *Id.* § 232.3(f)(1). And "credit" is "the right granted to a consumer by a creditor to defer payment of debt or to incur debt and defer its payment." *Id.* § 232.3(h). DOD further defines these terms by reference to TILA and its implementing Regulation Z. *See id.* § 232.2(i)(3)

6

(noting creditor must "meet[] the transaction standard for a 'creditor' under Regulation Z"); Limitations on Terms of Consumer Credit Extended to Service Members and Dependents, 80 Fed. Reg. 43560, 43560 (July 22, 2015) ("[C]onsumer credit covered under the MLA [will] be defined consistently with credit that for decades has been subject to the disclosure requirements of the Truth in Lending Act (TILA), codified in Regulation Z.").

At oral argument, the parties agreed the facts relevant to whether Empower is a "creditor [] extend[ing] consumer credit" were not in dispute, so the Court makes the determination as a matter of law. *See* 10 U.S.C. § 987(e)(3).

### A.     Whether Empower Cash Advance Extends "Credit"

Empower first argues Cash Advance does not extend credit because users do not have any legal obligation to repay advances. The Court disagrees.

To receive a cash advance, users must connect their bank accounts to their Empower accounts and "give Empower permission to initiate a withdrawal" from their bank accounts or charge their debit card "for the amount of the Empower Advance plus any applicable tip amount or delivery fee" when users receive their next paycheck. (Dkt. No. 26-8 at 5.) Empower then advances funds to users and schedules withdrawals for the following payday. (Dkt. No. 22 ¶ 87.) By providing users funds and imposing a procedure to collect those funds at a later date, Empower's Cash Advances provide consumers the right to "incur debt and defer its payment" to Empower and therefore extend "credit." *See* 32 C.F.R. § 232.3(h).

Furthermore, Empower Cash Advances fall within Regulation Z's scope of "credit," which aligns with the MLA's definition. *See* Limitations on Terms of Consumer Credit Extended to Service Members and Dependents, 80 Fed. Reg. at 43560. Regulation Z clarifies in its definition of credit:

> ***Payday loans; deferred presentment.*** Credit includes a transaction in which a cash advance is made to a consumer in exchange for the consumer's personal check, or in exchange for the consumer's authorization to debit the consumer's deposit account, and where the parties agree either that the check will not be cashed or deposited, or that the consumer's deposit account will not be debited, until a designated future date. This type of transaction is often referred to as a "payday loan" or "payday advance" or "deferred-presentment loan."

7

12 C.F.R. pt. 1026, Supp. I, Paragraph 2(a)(14) Credit, ¶ 2. Empower Cash Advances are "cash advance[s] [] made to a consumer . . . in exchange for the consumer's authorization to debit the consumer's deposit account . . . [at] a designated future date." *Id.* Because Congress directed DOD and the Federal Reserve Board "to fill up the details of [the] statutory scheme[s]" of the MLA and the TILA, respectively, the agencies' reasoned interpretations, within the constitutional bounds of its delegated authority, are entitled to deference. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024) (cleaned up); *see also Household Credit Servs. v. Pfenning*, 541 U.S. 232, 244-45 (2004) ("Congress has authorized the [Federal Reserve] Board to make 'such classifications, differentiations, or other provisions . . . as in the judgment of the Board are necessary or proper to effectuate the purposes of [TILA].'" (quoting 15 U.S.C. § 1604(a))).

Empower nevertheless contends Cash Advances do not provide "credit" because Empower describes its advances as "non-recourse" and disavows users' legal obligation to repay them. (Dkt. No. 26-8 at 5.) Empower primarily relies on Black's Law Dictionary, which defines "debt" as "Liability on a claim; a specific sum of money due by agreement or otherwise." *Black's Law Dictionary*, "Debt" (12th ed. 2024). But neither Black's Law Dictionary nor the MLA and its implementing regulations require a consumer receiving money and entering into debt to have a *legal* obligation to repay that debt. *See also Olson v. Unison Agreement Corp.*, No. 23-2835, 2025 WL 2254522, at *3 (9th Cir. Aug. 7, 2025) (finding statute's definition of "consumer credit obligation" did not require legal recourse). Instead, users incur debt because, upon receiving a Cash Advance, "a specific sum of money [becomes] due by agreement" with Empower, which Empower will automatically collect.

Empower's argument users have no obligation to repay Empower because they can disconnect—and have disconnected—their bank accounts prior to Empower's withdrawals is unavailing. First, users who later disconnect their bank accounts still at the time of registration give Empower permission to collect repayment at a later date. Second, Empower's Terms of Service recognize Empower retains some right to repayment by "reserv[ing] the right to deny [] access to Empower Advance if . . . [a user] do[es] not repay the full balance of an Empower Advance." (Dkt. No. 26-8 at 5.) Empower's reliance on *Consumer Financial Protection Bureau*

8

*v. Snap Finance LLC*, No. 2:23-cv-00462-JNP-JCB, 2024 WL 3625007 (D. Utah Aug. 1, 2024), is therefore misplaced. *Id.* at *8 (considering agreement's "formal terms" rather than its "practical operation" to decide whether "credit" was extended). That some users avoid their obligation to repay Empower does not mean no obligation ever exists.

So, based on the undisputed facts, Empower Cash Advances extend "credit" within the meaning of the MLA.

**B.     Whether Empower Extends Credit "Subject to a Finance Charge"**

Empower argues even if Cash Advances extend credit, "consumer credit" must be extended "[s]ubject to a finance charge," and Empower's Subscription Fee and Instant Transfer Fee are not finance charges.[2] *See* 32 C.F.R. § 232.3(f)(1).

"Finance charge has the same meaning as 'finance charge' in Regulation Z." *Id.* § 232.3(n). Under Regulation Z, a "finance charge" is "the cost of the consumer credit as a dollar amount," and "includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit." 12 C.F.R. § 1026.4(a). The Supreme Court has explained "the phrase 'incident to or in conjunction with' implies some *necessary* connection between the antecedent and its object," but "does not make clear whether a substantial (as opposed to a remote) connection is required." *Pfenning*, 541 U.S. at 240-41 (citation omitted); *see also Orubo v. Activehours, Inc.*, 780 F. Supp. 3d 927, 937 (N.D. Cal. 2025) ("All that is required is a connection between the imposition of the charge and the extension of credit.").

Plaintiffs have shown Empower's Instant Transfer Fee is a finance charge. Users must pay the Instant Transfer Fee to obtain an Empower Cash Advance instantly, so the Instant Transfer Fee is at least "incident to" Empower's ***instant*** extension of credit. And, by advertising and encouraging Cash Advance's ability to provide instant funds, Empower has made instant extension of credit a material term of its Cash Advance product. *See Orubo*, 780 F. Supp. 3d at

---

[2] "Consumer credit" includes credit "(i) Subject to a finance charge; or (ii) Payable by a written agreement in more than four installments." 32 C.F.R. § 232.3(f)(1). Because Plaintiffs do not argue an Empower Cash Advance is payable in installments, only the "subject to a finance charge" element is at issue.

9

938 ("The time at which funds are received is a material term of credit."); *see also* Truth in Lending, 61 Fed. Reg. 42937, 49239 (Sept. 19, 1996) ("[E]ven though a lender may not require a particular loan feature, the feature may become a term of the credit if it is included."). Empower advertises its Cash Advance product in its website, app, and marketing as a service offering "instant cash." (Dkt. No. 22 ¶ 61.) Empower's website also "emphasizes the ability of users to use Empower Advance to cover emergencies and provide funds when the borrower is at the point of sale" and lists examples of "[r]eal-life moments when [] customers used Cash Advance," including "Flat tire," "Grocery checkout," "Gas for the car," and "Vet bills." (*Id.* ¶ 68 n.24.) In addition, Empower has designed its app's user interface for Cash Advance to encourage users to pay the fee by "pre-selecting the fee option," and, when users choose not to pay the fee, presenting a pop-up warning: "It can take up to 2 business days for your funds to arrive . . . Consider selecting Instant or Empower delivery if you need your funds sooner." (*Id.* ¶¶ 63, 65 fig. 2.) So, receiving funds instantly—and thus paying Instant Transfer Fees—is necessary to receive credit on the terms Empower advertises and encourages. Instant Transfer Fees are therefore incident to obtaining Empower Cash Advance's credit on its offered terms and constitute finance charges.

Empower's mantra finance charges must be a mandatory condition of obtaining credit is incorrect. Regulation Z, and thus the MLA, defines a "finance charge" as a charge imposed by the creditor "as an incident to *or* a condition of the extension of credit." 12 C.F.R. § 1026.4(a) (emphasis added). Empower's insistence the fee must be a condition of the extension of credit ignores the language "as an incident to" even though Regulation Z uses that phrase as an alternative to a "condition of" the extension of credit. And, in *Pfenning* the Supreme Court held "incident to" requires "some *necessary* connection" between the fee and the extension of credit, not that the fee be a necessary condition to the extension of credit. *See Pfenning*, 541 U.S. at 240-41; *see also Orubo*, 780 F. Supp. 3d at 937 ("A necessary *connection* is not the same as a necessary *condition*."). Empower's interpretation of *Pfenning* as requiring the fee be a condition to the extension of credit relies on *Golubiewski v. Activehours, Inc.*, No. 3:22-cv-02078, 2024 WL 4204272 (M.D. Pa. Sept. 16, 2024), but the court subsequently reversed its interpretation upon "a deeper review of the law" and held plaintiffs only needed allege "a *connection* between [fees] and

10

the extension of credit." *See Golubiewski v. Activehours, Inc.*, No. 3:22-cv-02078, 2025 WL 2484192, at *6 (M.D. Pa. Aug. 28, 2025).

Empower's Instant Transfer Fee is also distinguishable from the Federal Express fee in *Veale v. Citibank, F.S.B.*, 85 F.3d 577 (11th Cir. 1996), and the expedited delivery fees for credit cards in the Federal Reserve Board's 2003 rule. *See* Truth in Lending, 68 Fed. Reg. 16185, 16187 (Apr. 3, 2003). First, in *Veale*, the Eleventh Circuit held the Federal Express Fee plaintiffs paid for Citibank to send a portion of its extended credit to repay plaintiffs' debts to other financial institutions was not a finance charge. *Id.* at 579. As an initial matter, the Eleventh Circuit assumed "incident to" requires the fee be a necessary condition of the extension of credit, but *Pfenning* later rejected that assumption. *See id.* (relying on plaintiffs' failure to "produce any evidence that Citibank required the fee before it would extend credit"). Further, whereas the Federal Express fee did not relate to Citibank's own extension of credit but rather the plaintiffs' repayment to other creditors, Empower's Instant Transfer Fee is a condition of Plaintiffs' receipt of instant credit from Empower. Second, expedited delivery fees for credit cards are not "incidental to the extension of credit" because they are paid to receive a card, rather than the extension of credit itself, more quickly. *See* Truth in Lending, 68 Fed. Reg. at 16187. Furthermore, absent advertisements and statements like Empower's, which make the instant extension of credit a material term of its Cash Advance product, an expedited receipt of credit may not be a material term of the extension of credit. So, Empower's analogies to the Federal Express Fee and credit card expedited delivery fees are unavailing.

Indeed, while several district courts have recently held fees charged to receive cash advances instantly are finance charges, Empower does not cite any case holding otherwise. *See Moss*, 2025 WL 2592265, at *4 (finding Express Fees were "intertwined with Cash Advance" and therefore finance charges); *Orubo*, 780 F. Supp. 3d at 938 (finding "lightning fee is a necessary condition of EarnIn's extension of credit on the terms offered" and therefore finance charge); *see also Johnson v. Activehours, Inc.*, No. 1:24-cv-02283-JRR, 2025 WL 2299425, at *9 (D. Md. Aug. 8, 2025) (finding lightning speed fee necessary to cash advance's "intended and advertised purpose" and therefore finance charge); *Golubiewski*, 2025 WL 2484192, at *6 (finding "lightning

11

speed fees" finance charges because "EarnIn makes it difficult to obtain the promised credit without paying the[m]").

So, because Empower's Instant Transfer Fee is a finance charge, Empower extends consumer credit. Therefore, Empower is a creditor extending consumer credit to covered borrowers, and the MLA prohibits Empower from compelling Plaintiffs to arbitrate their MLA claims.

## II.     ARBITRATION OF TILA AND GPLA CLAIMS

Plaintiffs argue the MLA also prohibits arbitration of Plaintiffs' TILA and GPLA claims. The MLA makes it "unlawful for any creditor to extend consumer credit to a covered member or a dependent of such a member with respect to which . . . the creditor requires the borrower to submit to arbitration . . . in the case of a dispute." 10 U.S.C. § 987(e)(3); *see also id.* § 987(f)(4) ("[N]o agreement to arbitrate any dispute involving the extension of consumer credit shall be enforceable against any covered member or dependent of such a member.") Under a straightforward reading of Sections 987(e)(3) and 987(f)(4), because Empower is a creditor extending consumer credit, no lawful or enforceable arbitration agreement exists between Empower and Plaintiffs, who Empower does not dispute are Covered Members.

Empower's argument the MLA only bars arbitration of claims arising from the MLA conflicts with the statute's stated application to "any dispute." *Id.* § 987(f)(4). At the very least, the MLA's prohibition on arbitration agreements with Covered Members prohibits arbitration here, where the same Terms of Service form the basis for Empower's motion to compel arbitration on all Plaintiffs' claims. *See Steines v. Westgate Palace, L.L.C.*, 113 F.4th 1335, 1344 (11th Cir. 2024) ("If the MLA applies to a contract involving the extension of consumer credit, the district court cannot enforce any agreement in that contract to arbitrate any dispute."). Empower's argument relies on *Espin v. Citibank, N.A.*, 126 F.4th 1010 (4th Cir. 2025), but the case is inapposite because the district court had not yet considered the MLA's applicability, and the Fourth Circuit therefore refused to rule on it. *Id.* at 1020. Given the intertwined factual bases of both the purported arbitration agreement and the merits of Plaintiffs' claims, the MLA's prohibition bars arbitration of Plaintiffs' TILA and GPLA claims. *See Moss*, 2025 WL 2592265,

12

at *5 (distinguishing *Espin* and refusing to compel arbitration of TILA claim "inextricably linked" to MLA claim).

Plaintiffs' proposed TILA and GPLA classes also include Georgia residents who are not Covered Members or dependents of Covered Members. The MLA's prohibition on arbitration agreements with Covered Members and their dependents may not extend to these Georgia residents, so Empower may have enforceable arbitration agreements as to these purported class members which preclude class certification. *See Lawson v. Grubhub, Inc.*, 13 F.4th 908, 913 (9th Cir. 2021) (affirming denial of class certification for proposed class including individuals who had waived class action participation rights). However, Empower's motion only demonstrates the existence of an arbitration agreement with named Plaintiffs, so the Court will not compel arbitration as to purported class members.

So, the Court denies Empower's motion to compel arbitration of Covered Member Plaintiffs' TILA and GPLA claims.

## CONCLUSION

Because the MLA prohibits enforcement of an arbitration agreement between Empower and named Plaintiffs as a matter of law, the Court DENIES Empower's motion to compel arbitration and stay litigation pending arbitration. The Court sets an initial case management conference for **November 19, 2025 at 2:00 p.m. via Zoom video**. A joint case management conference statement is due November 12, 2025. If Empower appeals the denial of the motion to compel arbitration, the Court will stay the case and vacate the initial case management conference. *See Coinbase, Inc. v. Bielski,* 599 U.S. 736, 747 (2023).

This Order disposes of Docket No. 26.

**IT IS SO ORDERED.**

Dated: October 7, 2025

JACQUELINE SCOTT CORLEY
United States District Judge

13